[Cite as *State v. Alexander*, 2022-Ohio-1812.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 21CA1144 |
| Plaintiff-Appellee, | : | <u>DECISION AND</u><br><u>JUDGMENT ENTRY</u> |
| v. | : | |
| Barry Alexander, | : | **RELEASED 5/24/2022** |
| Defendant-Appellant. | : | |

_____
<u>APPEARANCES</u>:

Brian T. Goldberg, Cincinnati, Ohio, for appellant.

David Kelley, Adams County Prosecutor, and Anthony Hurst, Assistant Adams County Prosecutor, West Union, Ohio, for appellee.
_____
Hess, J.

{¶1}   Barry Alexander appeals from a judgment of the Adams County Court of Common Pleas convicting him of aggravated possession of drugs.  In his first assignment of error, he contends that the court erred by not granting a mistrial as a sanction for discovery violations.  Alexander invited any error the court made in selecting the sanction for the first violation because he requested the sanction the court imposed.  With respect to the second violation, he has not shown that the court's decision to strike the testimony at issue and give curative instructions instead of granting a mistrial was unreasonable, arbitrary, or unconscionable.  Therefore, we overrule the first assignment of error.

{¶2}   In his second assignment of error, Alexander contends that the trial court erred when it denied his motion to suppress evidence seized during the execution of a search warrant.  Alexander asserts that the search was unconstitutional because law

enforcement intentionally delayed searching his residence until he arrived there in a vehicle so they could also search him and the vehicle under the terms of the warrant. However, he failed in his burden to establish that evidence obtained pursuant to the warrant should be suppressed.  Therefore, we overrule the second assignment of error.

{¶3}   In his third assignment of error, Alexander contends there was insufficient evidence to support his conviction, and it was against the manifest weight of the evidence. After viewing the evidence in a light most favorable to the prosecution, we conclude any rational trier of fact could have found the essential elements of aggravated possession of drugs proven beyond a reasonable doubt.  And after weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the jury's determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse the conviction.  Therefore, we overrule the third assignment of error.

{¶4}   In his fourth assignment of error, Alexander contends that the trial court erred by sentencing him under the Reagan Tokes Law because it is unconstitutional. Alexander did not challenge the constitutionality of the Reagan Tokes Law at the trial level, so he has forfeited all but plain error review as to this issue.  Alexander does not argue plain error, and even if he had, such an argument would fail because he has not met his burden to establish beyond a reasonable doubt that the law is unconstitutional. Thus, he cannot show that any error, much less plain error, occurred.  Therefore, we overrule the fourth assignment of error and affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶5} The Adams County grand jury indicted Alexander on one count of aggravated possession of drugs in violation of R.C. 2925.11(A), a first-degree felony. The grand jury later issued a supplemental indictment additionally charging him with trafficking in drugs in violation of R.C. 2925.03(A)(2), a first-degree felony. Alexander filed a motion to suppress evidence which the trial court denied after a hearing, and the matter proceeded to a two-day jury trial.

{¶6} Detective Sam Purdin of the Adams County Sheriff's Office testified that on March 2, 2021, he and Sergeant Brian Newland went to Alexander's residence on Elm Street in Peebles, Ohio, to execute a search warrant. No one appeared to be there, so they went to Fifth Avenue to serve arrest warrants while they waited for Alexander to come home. First, they tried to serve Elizabeth Michaels. As they pulled into her driveway, Detective Purdin saw Alexander, Josh Renschen, and Samantha Arey walking away from Michaels's trailer toward a maroon Toyota Camry. Alexander got in the front passenger seat, Arey got in the back seat, and Renschen started to get into the driver's seat but stopped when he saw law enforcement. Detective Purdin did not think any of them had a valid driver's license and spoke to Renschen about him not having a license. Renschen said he was not driving. Sergeant Newland knocked on Michaels's door, but she did not answer. Detective Purdin and Sergeant Newland left and went a couple of houses down where they unsuccessfully tried to serve a warrant on Roger Gilpin, Jr. Afterwards, Detective Purdin saw the Camry speeding down Fifth Avenue and pursued it with Sergeant Newland with the intent to conduct a traffic stop. However, the Camry pulled into Alexander's driveway before they could catch up to it.

{¶7}    Renschen and Arey exited the vehicle, and Alexander was sitting in the front passenger seat with the door open and one foot out of the vehicle.  Alexander had a cooler in his hands and "seemed to be concerned" about it.  He "appeared to just kind of be looking around" and "fidgeting with this cooler."  "He had sat it down a couple of times and picked it up.  And he started to get out of the car and then sat back down."  While Detective Purdin spoke to Renschen and Arey, Alexander exited the vehicle without the cooler.  Sergeant Newland read the search warrant to Alexander, and Detective Purdin retrieved the cooler from the Camry's front passenger floorboard, opened it, and saw "BA" written on the lid. Inside the cooler, he found hypodermic needles, a black zippered bag containing cash, and another zippered bag containing ten clear plastic baggies of what appeared to be methamphetamine.  Detective Purdin told Sergeant Newland about the suspected methamphetamine, and he advised Alexander of his *Miranda* rights.  Alexander acknowledged his rights and "just started inquiring about how many years he thought he would get and about a bill of particulars.  He wanted to know what he could to just kind of get it over with."   Subsequently, Alexander led Detective Purdin into his bedroom and pointed out a glass pipe and set of digital scales.  Detective Purdin testified that people who buy and sell methamphetamine use digital scales to weigh the drug.

{¶8}    Detective Purdin thought Alexander, who only has one eye, has difficulty seeing but did not know the extent of the problem. Detective Purdin assumed that Alexander could see some.  Alexander did not need assistance to walk from Michaels's trailer to the Camry or from the Camry to his residence, led Detective Purdin into the residence, and told Detective Purdin that he "could see shadows and make out figures and so forth."

{¶9} Sergeant Newland of the Adams County Sheriff's Office gave a similar account of the events of March 2, 2021, leading up to the execution of the search warrant. However, Sergeant Newland testified that he saw the cooler for the first time after Detective Purdin removed it from the Camry, searched it, and notified him about the suspected methamphetamine inside. Sergeant Newland advised Alexander of his *Miranda* rights and asked him how much methamphetamine was inside the cooler. Alexander said he did not know and asked Detective Purdin "how much time he would get." Renschen and Arey denied having any knowledge of the methamphetamine. Sergeant Newland had Detective Purdin put the cooler back in the Camry so he could photograph it. Sergeant Newland weighed the ten baggies in the cooler and performed a field test on the contents. The baggies weighed 287 grams and tested positive for the presence of methamphetamine. Sergeant Newland testified that a typical dose of methamphetamine is a tenth of gram, and 287 grams would be of 2,870 doses, which is more than a "personal use" amount.

{¶10} Pamela Farley, a forensic scientist at the Ohio Bureau of Criminal Investigation testified that she analyzed six of the ten baggies law enforcement found. The six baggies weighed 166.46 grams, plus or minus .08 grams, and contained methamphetamine. Farley did not analyze the other four baggies because even if they contained methamphetamine, the additional weight of the material in those baggies would not increase the penalty level in this case. Farley testified that methamphetamine is a schedule II controlled substance, and the bulk amount of it is three grams.

{¶11} The jury found Alexander guilty on both counts. The parties stipulated the offenses should merge for sentencing purposes, so the court merged them, and the state

elected to proceed to sentencing on the aggravated possession of drugs count. The court imposed an indefinite prison term of 11 to 16.5 years.

## II. ASSIGNMENTS OF ERROR

{¶12}  Alexander presents four assignments of error:

I.      The trial court erred to the prejudice of Mr. Alexander by refusing to grant a mistrial after prejudicial statements allegedly made by Mr. Alexander were elicited at trial that had not been provided to defense counsel.

II.     The trial court erred to the prejudice of Mr. Alexander by improperly denying his motion to suppress.

III.    The evidence was insufficient as a matter of law and/or against the manifest weight of the evidence to sustain Mr. Alexander's conviction.

IV.     The Reagan Tokes Act, as enacted by the Ohio legislator [sic] is unconstitutional, and the trial court erred by sentencing Mr. Alexander under that act.

## III. SANCTION FOR DISCOVERY VIOLATIONS

{¶13}  In his first assignment of error, Alexander contends that the trial court erred by refusing to grant a mistrial after state's witnesses testified about incriminating statements he allegedly made to law enforcement which the prosecutor failed to disclose to defense counsel during discovery.  Alexander asserts that the trial court abused its discretion because it imposed a sanction without inquiring into the circumstances surrounding the discovery violations and considering the three factors required by *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971.  Alexander asserts that if the trial court had conducted the proper inquiry, the least severe sanction for the violations that would have been consistent with the purpose of the discovery rules would have been a mistrial.

## A. Legal Principles

{¶14} "The overall objective of the criminal rules ' "is to remove the element of gamesmanship from a trial." ' " *Darmond* at ¶ 19, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987), quoting *State v. Howard*, 56 Ohio St.2d 328, 333, 383 N.E.2d 912 (1978). Crim.R. 16 governs discovery in criminal cases. Crim.R. 16(A) states that the purpose of the rule "is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." In addition, the Supreme Court of Ohio has stated that "[t]he purpose of the discovery rules 'is to prevent surprise and the secreting of evidence favorable to one party.' " *Darmond* at ¶ 19, quoting *Lakewood* at 3. "The overall purpose is to produce a fair trial." *Lakewood* at 3.

{¶15} Crim.R. 16(B)(1) states:

Upon receipt of a written demand for discovery by the defendant, * * * the prosecuting attorney shall provide copies or photographs, or permit counsel for the defendant to copy or photograph, the following items related to the particular case indictment, information, or complaint, and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant, within the possession of, or reasonably available to the state, subject to the provisions of this rule:

(1) Any written or recorded statement by the defendant * * *, including police summaries of such statements * * * [.]

{¶16} Crim.R. 16(L)(1) provides:

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

{¶17} "A trial court has broad discretion in determining a sanction for a discovery violation, and a trial court's decision will not be reversed absent an abuse of that discretion." *State v. Shelby*, 4th Dist. Lawrence No. 15CA20, 2016-Ohio-5721, ¶ 32, citing *State ex rel. Duncan v. Middlefield,* 120 Ohio St.3d 313, 2008-Ohio-6200, 898 N.E.2d 952, ¶ 27. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, at ¶ 34. "An abuse of discretion includes a situation in which a trial court did not engage in a ' "sound reasoning process." ' " *Id.*, quoting *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶18} The " 'trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery.' " *Darmond* at ¶ 42, quoting *Lakewood*, 32 Ohio St.3d 1, 511 N.E.2d 1138, at paragraph two of the syllabus. The Supreme Court of Ohio has "established three factors that should govern a trial court's exercise of discretion in imposing a sanction for a discovery violation committed by the prosecution." *Id.* at ¶ 35. They are "(1) whether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced." *Id.*

### B. The Discovery Violations and Sanctions

{¶19} The first discovery violation relates to the following exchange between the prosecutor and Detective Purdin on redirect examination during the first day of trial:

Q.      What happened with the cash [in the black bag]?

A.      Barry Alexander continued to ask that we speak to the sheriff and see if he could leave the money with his girlfriend, Helen.

Defense counsel objected, and during a sidebar, explained that the prosecutor did not disclose Alexander's alleged statement about the money in discovery. Defense counsel asked the court to strike it from the record. The court granted that request, instructed the jury to disregard testimony about the statement, and inquired whether any juror could not follow its instruction. No juror indicated an inability to do so. After another sidebar, the court again instructed the jury to disregard the testimony about Alexander's alleged statement. The court asked the jurors to raise their right hand if they could not follow the instruction. None of them did.

{¶20} The second discovery violation relates to the following exchange between the prosecutor and Sergeant Newland on direct examination during the first day of trial:

Q. Okay and then when you saw [the baggies containing a white crystalized substance] and you had read Mr. Alexander his rights immediately thereafter, what if anything did Mr. Alexander say about what was inside the cooler?

A. I initially asked him how much methamphetamine was inside the cooler. He stated that he didn't know. At that time he began asking Detective Purdin how much time he would get. And that he stated [sic], pardon my language, that he was fucked. And things of that nature.

Defense counsel requested a sidebar and explained that Alexander's alleged statement that he was "fucked" was not in the discovery he received and "seems to be a pretty damning statement to me." The prosecutor stated, "I don't think it is but that's what

[Sergeant] Newland just recalls. I don't know." Defense counsel requested a mistrial "because it's a pretty important statement," and in the alternative, requested a curative instruction. The prosecutor asserted that a mistrial was unnecessary and that "a curative statement is fine." The court denied the motion for a mistrial and instructed the jury to "strike from your consideration the suggested statement that the defendant stated that he was f'd * * * as if never heard." The court asked the jurors to raise their right hand if they could not "strike that from any and all consideration," and none of them did.

{¶21} At the end of day one, the court asked the jurors to raise their right hand if they felt, upon further reflection, that they could not follow the court's instructions to strike certain matters from their consideration. None of them did. On day two, defense counsel renewed his motion for a mistrial. The court acknowledged Alexander's alleged statement that he was "fucked" was potentially inculpatory. However, the court noted that it had given the jury curative instructions, that none of the jurors indicated they could not follow them, and that the jurors "seemed very accepting that the rules are the rules." Therefore, the court decided to deny the renewed motion for a mistrial and give the jury another curative instruction prior to deliberations. Defense counsel then stated:

> I want to put on the record; it's my duty also to disclose to the Court that I don't believe that this was any type of intentional misconduct by the prosecutor's office. There was nothing indicative to me of them hiding evidence or intentionally holding that in their back pocket. I think that, you know, if they knew about it I believe they would have disclosed it to me. But I just want to put on the record they were cooperative with me.

The court stated, "Of course the Court is a constant observer. And I would have to join it did not appear to the Court to be a tactic of surprise." And prior to deliberations, the court gave another curative instruction as promised.

### C.  Analysis of Discovery Violation 1

**{¶22}**  Alexander invited any error the trial court made in not granting a mistrial as a sanction for the state's failure to disclose his alleged statement about the money. The invited-error doctrine precludes a litigant from " 'tak[ing] advantage of an error which [the litigant] invited or induced.' " *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 279, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co., Lincoln-Mercury Div.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. The Supreme Court of Ohio " 'has found invited error when a party has asked the court to take some action later claimed to be erroneous, or affirmatively consented to a procedure the trial judge proposed.' " *Id.*, quoting *State v. Campbell*, 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000).  Alexander did not request a mistrial as a sanction for the state's failure to disclose his alleged statement about the money.  Rather, he asked the court to strike Detective Purdin's testimony about the statement from the record.  The trial court granted the requested sanction and gave the jury multiple curative instructions. Alexander cannot now complain on appeal that the court erred by granting the sanction he requested instead of a mistrial.

### D.  Analysis of Discovery Violation 2

**{¶23}**  Alexander has not demonstrated that the trial court abused its discretion by not granting a mistrial as a sanction for the state's failure to disclose his alleged statement that he was "fucked."  Alexander admits that it does not appear that the discovery violation was intentional but asserts that through the exercise of due diligence, the prosecutor could have "easily learned" about the alleged statement by speaking to his witnesses prior to trial.  However, during the motion to suppress hearing, the prosecutor specifically asked

Sergeant Newland whether Alexander had made "any other acknowledgements or inculpatory statements" after being advised of his *Miranda* rights aside from the ones Sergeant Newland had already testified to at the hearing. Sergeant Newland said, "Not to me he did not." Therefore, the prosecutor had no reason to make additional inquiries of him about the subject prior to trial.

{¶24} Nothing in the record suggests that Sergeant Newland remembered and disclosed the alleged statement to the prosecutor before trial. When defense counsel objected to Sergeant Newland's testimony about it, the prosecutor made the comment that the statement was "what [Sergeant] Newland just recalls," implying the prosecutor had no prior knowledge of it. Later, defense counsel essentially admitted that he did not believe the discovery violation was willful, and the court indicated it agreed, stating that it was a "constant observer" and that "it did not appear to the Court to be a tactic of surprise." Although the court made this comment after it denied the motions for a mistrial, the comment nonetheless indicates that the court considered the willfulness factor. The fact that the discovery violation was not willful weighs in favor of the court's decision to strike the alleged statement and give the jury curative instructions instead of granting the more severe sanction of a mistrial.

{¶25} The trial court did not expressly address whether foreknowledge of the alleged statement would have benefited Alexander in the preparation of his defense. However, Alexander has not identified any potential benefit aside from the fact that defense counsel "could have been prepared to address" the statement in voir dire and opening statements and "formulated his cross-examination more appropriately." The only way this preparation could have benefited Alexander's defense is if the trial court had

allowed the statement into evidence, which it did not. Alexander also asserts that if defense counsel had known about the statement, "there might have been discussions about a plea resolution before proceeding with a jury trial." However, we fail to see how a possibility of pre-trial plea negotiations would have benefitted Alexander in the preparation of his defense. Therefore, we conclude that the trial court's decision to strike the alleged statement and give curative instructions was sufficient to ensure Alexander did not lose any benefit in the preparation of his defense due to the discovery violation.

{¶26} Alexander claims he was "extremely prejudiced by the discovery violation" because the alleged statement amounts to an admission of guilt which undermines his defense that the state could not prove that he possessed the methamphetamine. The prejudice he identifies is not a result of the discovery violation but rather is a result of the incriminating nature of the statement itself. In any event, the record reflects that the trial court did consider the fact that the alleged statement was potentially inculpatory and whether the jurors would be able to follow the court's curative instructions. Although Alexander asserts that the curative instructions were insufficient to guarantee he had a fair trial, the jury is presumed to follow them. *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). Nothing in the record rebuts that presumption. Therefore, the trial court's decision to strike the alleged statement from evidence and give curative instructions was sufficient to relieve any prejudice the discovery violation created.

{¶27} Based on the foregoing, we cannot conclude that the trial court's determination that the least severe sanction consistent with the purpose of the discovery rules was to strike the alleged statement and give curative instructions was unreasonable, arbitrary, or unconscionable. " '[T]he trial judge is in the best position to determine

whether the situation in [the] courtroom warrants the declaration of a mistrial.' " (Alterations sic.) *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 92, quoting *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988). "[M]istrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *Garner* at 59. Such circumstances are not present in this case.

### E. Conclusion on First Assignment of Error

{¶28} For the foregoing reasons, we conclude that the trial court did not err by not granting a mistrial as a sanction for discovery violations. Accordingly, we overrule the first assignment of error.

### IV. MOTION TO SUPPRESS

{¶29} In his second assignment of error, Alexander contends that the trial court erred when it denied his motion to suppress. Alexander asserts that "law enforcement intentionally delayed executing the search warrant" until he arrived at his residence in a motor vehicle so that they could search him and the vehicle pursuant to the search warrant. He asserts that "there was no reason for law enforcement to not immediately execute the search warrant" because "[t]hey were in close proximity" to his residence and "made contact with him" while attempting to serve Michaels. Alexander claims that "[t]his intentional delay was unlawful and invalidated the search." Alexander states that he is not aware of any Ohio courts which have addressed this issue and that federal caselaw he found on the subject indicates it is "likely not unlawful for police to intentionally manipulate the timing of executing a search warrant." Nonetheless, he claims that "[p]ossession of a valid search warrant does not permit law enforcement to prolong executing the warrant to search other people or vehicles coming onto the property" and

that we should require law enforcement to have "a separate warrant or other probable cause" to search him or the Camry. Otherwise, law enforcement will be able "to obtain a search warrant and lay in wait until certain people or motor vehicles arrive on the property."

{¶30} Generally, "appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The Supreme Court of Ohio has explained:

> When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Citations omitted.) *Burnside* at ¶ 8.

{¶31} "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15. The Supreme Court of Ohio has held that these provisions provide the same protection in felony cases. *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 18. "This constitutional guarantee is protected by the exclusionary rule, which mandates the exclusion at trial of evidence obtained from an unreasonable search and seizure." *State v. Petty*, 2019-Ohio-4241, 134 N.E.3d 222, ¶ 11 (4th Dist.).

{¶32} For a search or seizure to be reasonable under the Fourth Amendment, it must be based on probable cause and executed pursuant to a warrant, unless an

exception to the warrant requirement applies. *State v. Moore*, 90 Ohio St.3d 47, 49, 734 N.E.2d 804 (2000). The Fourth Amendment also requires that law enforcement "execute search warrants in a reasonable manner." *State v. Gipson*, 3d Dist. Hancock No. 5-09-19, 2009-Ohio-6234, ¶ 25. "When a motion to suppress attacks the validity of a search conducted under a warrant, the burden of proof is on the defendant to establish that evidence obtained pursuant to the warrant should be suppressed." *State v. Wallace*, 2012-Ohio-6270, 986 N.E.2d 498, ¶ 27 (7th Dist.), citing *State v. Dennis*, 79 Ohio St.3d 421, 426, 683 N.E.2d 1096 (1997).

**{¶33}** At the suppression hearing, Sergeant Newland testified that he applied for the search warrant on March 2, 2021, sometime before noon. The same day, a judge issued a search warrant commanding law enforcement to search Alexander's residence and "any and all other outbuildings, curtilage, vehicles and/or persons located on the property." Consistent with Crim.R. 41(C)(2), the warrant commanded that law enforcement serve the warrant and perform the search "during the daytime within 3 days from the issuance of this order." *See* Crim.R. 41(C)(2) ("A search warrant shall command the officer to search, within three days, the person or place named for the property specified"). Law enforcement executed the search warrant around 4:00 p.m. the day it was issued. Sergeant Newland admitted that they were waiting to execute the search warrant until the Camry was present because that would indicate Alexander was home, and they had reason to believe he would have methamphetamine with him. Detective Purdin testified that they were waiting to execute the search warrant until they thought Alexander was home because they assumed he "would have methamphetamine and that he would have it on his person or with him close by."

{¶34} Alexander has not shown that law enforcement executed the search warrant in an unreasonable manner. Law enforcement had three days to execute the search warrant[1] and did so well within that timeframe. Alexander cites no legal authority which stands for the proposition that the Fourth Amendment prohibits law enforcement from intentionally timing the execution of a search warrant for strategic purposes. He acknowledges that the only legal authority he found on the subject supports the opposite conclusion. If legal authority exists to support his assignment error, it is not our duty to root it out. *Koscielak v. United Ohio Ins. Co.*, 3d Dist. Defiance No. 4-19-20, 2020-Ohio-3224, ¶ 28, quoting *Harris v. Nome*, 9th Dist. Summit No. 21071, 2002-Ohio-6994, ¶ 15 (" 'It is not the obligation of an appellate court to search for authority to support an appellant's argument as to an alleged error' "). Accordingly, we conclude that the trial court did not err when it denied the motion to suppress, and we overrule the second assignment of error.

## V. SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE

{¶35} In his third assignment of error, Alexander contends that there was insufficient evidence to support his conviction and that his conviction was against the manifest weight of the evidence. Alexander suggests that he could not be convicted of either charged offense because the state failed to show he knowingly possessed the

---

[1] At least one appellate court has held that Crim.R. 45(A) applies when calculating the three-day time period for the execution of a search warrant under Civ.R. 41(C)(2). *Dawson v. Richmond Heights*, 8th Dist. Cuyahoga No. 105938, 2018-Ohio-1301, ¶ 21. Crim.R. 45(A) states: "In computing any period of time prescribed or allowed by these rules, * * * the date of the act or event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday, or legal holiday, in which event the period runs until the end of the next day which is not Saturday, Sunday, or legal holiday. When the period of time prescribed or allowed is less than seven days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in computation." Thus, the three-day period to execute a search warrant may exceed three calendar days. However, we need not consider the applicability of Crim.R. 45(A) in this case because law enforcement executed the search warrant the same day it was issued.

methamphetamine in the cooler. He implies that evidence of the location in which the cooler was found in the vehicle is unreliable because no one photographed the cooler before Detective Purdin removed it from the vehicle. Alexander highlights the fact that in addition to him, two other people had occupied the vehicle in which the cooler was found. He also emphasizes that he "did not run or make any efforts to conceal the drugs," that there was no "forensic evidence" linking him to the drugs, and that he has vision issues "which likely made it difficult for him to see what was inside the cooler."

{¶36} In reviewing the sufficiency of the evidence for a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4, and following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness." *State v. Anderson*, 4th Dist. Highland No. 18CA14, 2019-Ohio-395, ¶ 13. "That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Musacchio v. United States*, 577 U.S. 237, 243, 136 S.Ct. 709, 193 L.Ed.2d 639 (2016), quoting *Jackson* at 319.

{¶37} In determining whether a conviction is against the manifest weight of the evidence, an appellate court

> must review the entire record, weigh the evidence and all reasonable
> inferences, consider the credibility of witnesses, and determine whether, in

resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. In order to satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt.

Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. However, we are reminded that generally, it is the role of the jury to determine the weight and credibility of evidence. " 'A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.' " *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17, quoting *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23. We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility.

(Citations omitted.) *Anderson* at ¶ 14-15.

**{¶38}** Although the jury found Alexander guilty of aggravated possession of drugs and trafficking in drugs, the trial court merged the offenses and sentenced Alexander only on the aggravated possession of drugs count. As a result, if we conclude Alexander's conviction on that count was supported by sufficient evidence and was not against the manifest weight of the evidence, an erroneous verdict on the merged count would be harmless. *See State v. Wickersham*, 4th Dist. Meigs No. 13CA10, 2015-Ohio-2756, ¶ 21. Therefore, it would be unnecessary for us to address his sufficiency and manifest weight of the evidence argument with regard to the trafficking in drugs count. *See id.*

**{¶39}** R.C. 2925.11(A), the statute on drug possession offenses, states: "No person shall knowingly obtain, possess, or use a controlled substance * * *." "If the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule * * * II * * * whoever violates division (A) of this section is guilty of aggravated possession of drugs." R.C. 2925.11(C)(1). "If the amount of the drug involved equals or

exceeds fifty times the bulk amount but is less than one hundred times the bulk amount, aggravated possession of drugs is a felony of the first degree * * *." R.C. 2925.11(C)(1)(d).

**{¶40}** R.C. 2901.22(B) states:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{¶41}** " 'Possess' * * * means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). " 'Possession * * * may be individual or joint, actual or constructive.' " (Alteration sic.) *State v. Whitehead*, 4th Dist. Scioto No. 20CA3931, 2022-Ohio-479, ¶ 89, quoting *State v. Wolery*, 46 Ohio St.2d 316, 332, 348 N.E.2d 351 (1976). "Actual possession exists when the circumstances indicate that an individual has or had an item within [the individual's] immediate physical possession." *State v. Fry,* 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747, ¶ 39. "Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within [the individual's] immediate physical possession." *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982), syllabus. "For constructive possession to exist, the state must show that the defendant was conscious of the object's presence." *Whitehead* at ¶ 89, citing *Hankerson* at 91.

{¶42} The state introduced evidence from which any rational trier of fact could have found the essential elements of aggravated possession of drugs proven beyond a reasonable doubt, and in resolving conflicts in the evidence, the jury did not clearly lose its way or create such a manifest miscarriage of justice that reversal of the conviction for that offense is necessary. There is evidence that Alexander had actual possession of the cooler, which contained methamphetamine, a schedule II controlled substance, in an amount which equaled or exceeded 50 times the bulk amount but was less than 100 times the bulk amount. Detective Purdin testified that he saw the cooler in Alexander's hands and watched him pick it up and put it down multiple times while sitting in the front passenger seat of the Camry. There is also evidence that Alexander was knowingly in possession of the methamphetamine. His initials were inside the cooler, suggesting it belonged to him. His nervous behavior in the presence of law enforcement—looking around, fidgeting with the cooler, and acting indecisive about whether to get out of the Camry—indicates he knew the drugs were inside his cooler. Alexander made statements suggestive of guilt, asking about "how many years" he would get and expressing a desire to "get it over with." In addition, he had drug-related paraphernalia inside his residence, which he had just traveled to with the cooler.

{¶43} Sufficient evidence supports the aggravated possession of drugs conviction and it was not against the manifest weight of the evidence. Consequently, any error the jury may have committed by finding Alexander guilty of the merged offense of trafficking in drugs is harmless, and we need not consider Alexander's arguments as they relate to that offense. Accordingly, we overrule the third assignment of error.

## VI.  REAGAN TOKES LAW

**{¶44}** In his fourth assignment of error, Alexander contends that the trial court erred by sentencing him under the Reagan Tokes Law because it is unconstitutional.

**{¶45}** The Reagan Tokes Law encompasses four newly enacted statutes and amendments to 50 existing statutes.  R.C. 2901.011.  Relevant here, the Reagan Tokes Law requires that a court imposing a prison term under R.C. 2929.14(A)(1)(a) or (2)(a) for a first or second degree felony committed on or after March 22, 2019, impose a minimum prison term under that provision and a maximum prison term determined under R.C. 2929.144(B).  R.C. 2929.144(A) and (C).  There is a presumption that the offender "shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier."  R.C. 2967.271(B).  A presumptive earned early release date is a date determined under procedures described in R.C. 2967.271(F) which allow the sentencing court to reduce the minimum prison term under certain circumstances.  R.C. 2967.271(A)(2).

**{¶46}** R.C. 2967.271(C) states that the Ohio Department of Rehabilitation and Correction ("ODRC") may rebut the presumption in R.C. 2967.271(B) if it

determines, at a hearing, that one or more of the following applies:

(1)     Regardless of the security level in which the offender is classified at the time of the hearing, both of the following apply:

(a) During the offender's incarceration, the offender committed institutional rule infractions that involved compromising the security of a state correctional institution, compromising the safety of the staff of a state correctional institution or its inmates, or physical harm or the threat of physical harm to the staff of a state correctional institution or its inmates, or committed a violation of law that was not prosecuted, and the infractions or violations demonstrate that the offender has not been rehabilitated.

(b) The offender's behavior while incarcerated, including, but not limited to the infractions and violations specified in division (C)(1)(a) of this section, demonstrate that the offender continues to pose a threat to society.

(2) Regardless of the security level in which the offender is classified at the time of the hearing, the offender has been placed by the department in extended restrictive housing at any time within the year preceding the date of the hearing.

(3) At the time of the hearing, the offender is classified by the department as a security level three, four, or five, or at a higher security level.

If ODRC rebuts the presumption, it "may maintain the offender's incarceration" after the expiration of the minimum prison term or presumptive earned early release date for a reasonable period of time, determined and specified by ODRC, which "shall not exceed the offender's maximum prison term." R.C. 2967.271(D)(1).

{¶47} Alexander asserts that the Reagan Tokes Law violates the separation of powers doctrine because it allows ODRC, an executive agency, to "extend a prison sentence" if it concludes an offender committed an unprosecuted violation of law while incarcerated. He claims this amounts to an exercise of judicial authority which the legislature cannot delegate to the executive branch, relying on *State ex rel. Bray v. Russell*, 89 Ohio St.3d 132, 729 N.E.2d 359 (2000), to support his position. Alexander also asserts that the Reagan Tokes Law violates procedural due process because offenders have a liberty interest in being released on their presumptive release date, and the law allows ODRC to "extend a prison sentence when an offender commits a violation of law." He quotes *White v. Konteh*, 11th Dist. Trumbull No. 99-T-0020, 1999 WL 587976, *5 (Mar. 23, 1999), for the proposition that "[i]t is a fundamental tenet of due process that the decision to restrict an individual's freedom can only be made by a neutral magistrate, not by law enforcement officials whose primary purpose is to place offenders in jail." As

used in that case, the phrase "neutral magistrate" refers to "a duly elected or appointed judge of this state." *White* at *5, fn. 2.

**{¶48}** The constitutionality of a statute presents a question of law we review de novo. *Hayslip v. Hanshaw*, 2016-Ohio-3339, 54 N.E.3d 1272, ¶ 27 (4th Dist.). "Statutes are presumed to be constitutional." *State v. Noling*, 136 Ohio St.3d 163, 2013-Ohio-1764, 992 N.E.2d 1095, ¶ 25. "A statute will be upheld unless the challenger meets the burden of establishing beyond a reasonable doubt that the statute is unconstitutional." *Id.*

**{¶49}** "A party may challenge a statute as unconstitutional on its face or as applied to a particular set of facts." *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37. "A facial challenge to a statute is the most difficult to bring successfully because the challenger must establish that there exists no set of circumstances under which the statute would be valid. The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid." (Citation omitted.) *Id.* Moreover, R.C. 1.50 states: "If any provision of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable."

**{¶50}** " '[T]he question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court.' " *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15, quoting *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986). "We may review the trial court decision for plain error, but we require a showing that but for a plain or obvious error, the

outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." (Citation omitted.) *Id.* at ¶ 16. "The burden of demonstrating plain error is on the party asserting it." *Id.* The Supreme Court of Ohio has also "stated that a forfeited constitutional challenge to a statute is subject to review 'where the rights and interests involved may warrant it.' " *Id.*, quoting *In re M.D.*, 38 Ohio St.3d 149, 527 N.E.2d 286 (1988), syllabus.

{¶51} Although Alexander challenges the facial constitutionality of the Reagan Tokes Law in its entirety, his argument focuses on R.C. 2967.271(C) and (D). Alexander has not yet served his minimum sentence and been subject to the application of the specific provisions of the Reagan Tokes Law he asserts make it unconstitutional. In prior decisions, this court "repeatedly held that the constitutionality of sentencing pursuant to the Reagan Tokes Law is not yet ripe because on direct appeal an appellant has yet to serve his or her minimum prison term, which is the first instance in which the department of corrections could take any action that affects the length of an appellant's incarceration." *State v. Meadows*, 4th Dist. Ross No. 20CA3734, 2022-Ohio-287, ¶ 44. However, in *State v. Maddox,* Slip Opinion No. 2022-Ohio-764, the Supreme Court of Ohio recently held that "a criminal defendant's challenge to the constitutionality of R.C. 2967.271 is ripe for review on the defendant's direct appeal of his or her conviction and prison sentence." *Maddox* at ¶ 22. Therefore, we will address the merits of Alexander's constitutional arguments.

{¶52} Alexander did not challenge the constitutionality of the Reagan Tokes Law at the trial level and has therefore forfeited all but plain error review. *State v. Conant*, 4th Dist. Adams No. 20CA1108, 2020-Ohio-4319, ¶ 4. Alexander has not argued plain error

on appeal, and even if he had, as we explain below, such an argument would fail because he has not met his burden to establish beyond a reasonable doubt that the law is unconstitutional. Thus, he cannot show that any error, much less plain error, occurred.

{¶53} Alexander has failed in his burden to establish beyond a reasonable doubt that the Reagan Tokes Law is unconstitutional because it violates the separation of powers doctrine. His reliance on *Bray* is misplaced. In that case, the Supreme Court of Ohio considered a facial challenge to the constitutionality of now repealed R.C. 2967.11, also known as the "bad-time statute." *Bray*, 89 Ohio St.3d at 134, 729 N.E.2d 359.

{¶54} Former R.C. 2967.11(B) stated:

> As part of a prisoner's sentence, the parole board may punish a violation committed by the prisoner by extending the prisoner's stated prison term for a period of fifteen, thirty, sixty, or ninety days in accordance with this section. * * * If a prisoner's stated term is extended under this section, the time by which it is so extended shall be referred to as "bad time."

A "violation" was defined as "an act that is a criminal offense under the law of this state or the United States, whether or not a person is prosecuted for the commission of the offense." Former R.C. 2967.11(A). "Other sections in [former] R.C. 2967.11 set forth the procedures to be followed to determine whether a 'violation,' a crime, [had] been committed." *Bray* at 135.

{¶55} *Bray* held that the bad-time statute violated the separation of powers doctrine and was therefore unconstitutional. *Id.* at 136. The court explained that "[i]n our constitutional scheme, the judicial power resides in the judicial branch," and "[t]he determination of guilt in a criminal matter and the sentencing of a defendant convicted of a crime are solely the province of the judiciary." *Id.* Provisions of the bad-time statute "enable[d] the executive branch to prosecute an inmate for a crime, to determine whether

a crime [had] been committed, and to impose a sentence for that crime." *Id.* at 135. This was "no less than the executive branch's acting as judge, prosecutor, and jury." *Id. Bray* explained that the bad-time statute "intrude[d] well beyond the defined role of the executive branch as set forth in our Constitution," *id.*, because [t]rying, convicting, and sentencing inmates for crimes committed while in prison is not an exercise of executive power," *id.* at 136.

{¶56} The Second District Court of Appeals has explained that *Bray* does not "compel the conclusion that the Reagan Tokes Law violates the separation of powers doctrine" because

> there is a significant distinction between the imposition of "bad time" as allowed by R.C. 2967.11 and the Reagan Tokes Law. R.C. 2967.11 authorized the parole board to sentence a defendant to an additional prison term beyond that which had been imposed by the trial court. In *Bray*, the defendant had served the entirety of the definite sentence imposed by the trial court; the parole board then tacked an additional prison term onto the defendant's sentence. In contrast, under Reagan Tokes, the executive branch cannot keep a defendant in prison beyond the maximum sentence imposed by the trial court. In short, Reagan Tokes does not allow the ODRC to lengthen a defendant's sentence beyond the maximum sentence imposed by the trial court.

*State v. Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, ¶ 36. *Accord State v. Hacker*, 2020-Ohio-5048, 161 N.E.3d 112, ¶ 22 (3d Dist.), *appeal allowed in part by* 161 Ohio St.3d 1449, 2021-Ohio-534, 163 N.E.3d 585. *See also State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536, ¶ 34-38 (8th Dist.), *appeal allowed by* 2022-Ohio-1485 We agree with this reasoning and therefore reject Alexander's argument that the Reagan Tokes Law violates the separation of powers doctrine.

{¶57} Alexander has also failed in his burden to establish beyond a reasonable doubt that the Reagan Tokes Law is facially unconstitutional because it violates due

process.  The Due Process Clause in the Fourteenth Amendment to the United States Constitution states:  "No State shall * * * deprive any person of life, liberty, or property, without due process of law * * *."  The Due Course of Law Clause in Article I, Section 16 of the Ohio Constitution provides:  "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."  "The two clauses provide equivalent due process protections."  *State v. Wheatley*, 2018-Ohio-464, 94 N.E.3d 578, ¶ 28 (4th Dist.), citing *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 15.

{¶58}  "Although the concept is flexible, at its core, procedural due process under both the Ohio and United States Constitutions requires, at a minimum, an opportunity to be heard when the state seeks to infringe a protected liberty or property right."  *State v. Cowan*, 103 Ohio St.3d 144, 2004-Ohio-4777, 814 N.E.2d 846, ¶ 8.  "[T]he opportunity to be heard must occur at a meaningful time and in a meaningful manner."  *Id.*  "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness."  *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).  The United States Supreme Court has " 'defined the category of infractions that violate "fundamental fairness" very narrowly' based on the recognition that, '[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.' "  *Medina v. California*, 505 U.S. 437, 443, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990).  "The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those

constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order." *Id.*

{¶59} "A procedural due process analysis begins by examining 'whether there exists a liberty or property interest of which a person has been deprived.' " *Wheatley* at ¶ 31, quoting *Swarthout v. Cooke*, 562 U.S. 216, 219, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011). "If the person has been deprived of a protected liberty or property interest, the question becomes 'whether the procedures followed by the State were constitutionally sufficient.' " *Id.*, quoting *Swarthout* at 219.

{¶60} Even if we agreed that R.C. 2967.271(C) and (D) deprive offenders of a protected liberty interest, Alexander's suggestion that due process requires that the sentencing court, rather than ODRC, conduct the R.C. 2967.271(C) hearing and make the decision whether to maintain the offender's incarceration is not well-taken. The Twelfth District Court of Appeals has rejected a similar due process argument, explaining:

> The hearings conducted by the ODRC under R.C. 2967.271(C) are analogous to parole revocation proceedings, probation revocation proceedings, and postrelease control violation hearings * * *. This is because, as noted by the state as part of its appellate brief, "[a]ll three situations concern whether a convicted felon has committed violations while under the control and supervision of the [ODRC]." Therefore, because due process does not require the sentencing court to conduct parole revocation proceedings, probation revocation proceedings, or postrelease control violation hearings, we likewise conclude that due process does not require the sentencing court to conduct a hearing under R.C. 2967.271(C) to determine whether the ODRC has rebutted the presumption set forth in R.C. 2967.271(B).

(Alterations sic.) *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837, ¶ 17. *See also Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, at ¶ 38, fn. 2 (observing that appellant's assertion that he had a due process right to have a judge

determine whether to extend the presumed minimum prison term under the Reagan Tokes Law, "though precluded by waiver, does not seem well founded" because "[t]he extension of a defendant's sentence beyond the presumptive minimum term is akin to the decision to grant or deny parole," and "[t]he parole decision in Ohio is an executive function that does not involve the judiciary"). We agree with this reasoning and therefore reject Alexander's argument that the Reagan Tokes Law violates due process.

**{¶61}** Because Alexander has failed in his burden to establish beyond a reasonable doubt that the Reagan Tokes Law is unconstitutional, we overrule his fourth assignment of error.

## VII. CONCLUSION

**{¶62}** Having overruled the four assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the ADAMS COUNTY COURT OF COMMON PLEAS to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
     Michael D. Hess, Judge



### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**