[Cite as *In re A.B.*, 2024-Ohio-2952.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| In the Matter of: | : | Case No. 24CA3 |
| A.B. | : | <u>DECISION AND</u> |
| K.H. | | <u>JUDGMENT ENTRY</u> |
| | : | |
| Adjudicated Dependent Children. | : | **RELEASED 7/30/2024** |

_____
<u>APPEARANCES</u>:

Steven H. Eckstein, Washington Court House, Ohio, for appellant.

Anneka P. Collins, Highland County Prosecutor, and Molly Bolek, Highland County Assistant Prosecutor, Hillsboro, Ohio, for appellee.
_____
Hess, J.

{¶1} The father of A.B. and K.H. appeals a judgment of the Highland County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to the Highland County Department of Job & Family Services, Children Services Division (the "Agency"). Father presents one assignment of error asserting the permanent custody award is against the manifest weight of the evidence because it was not based on competent, credible evidence. For the reasons which follow, we overrule the assignment of error and affirm the juvenile court's judgment.

I. FACTS AND PROCEDURAL HISTORY

A. Initial Proceedings

{¶2} On September 13, 2021, the Agency filed a complaint under two case numbers alleging A.B., then age five, and K.H., then age three, appeared to be abused, neglected, and/or dependent children. The complaint alleged that the Greenfield Police

Department notified the Agency that the children's maternal grandmother reported that A.B. told her that "papaw Bob (paternal) touched her monkey with is monkey [sic]." Maternal grandmother told an Agency employee that she had cared for the children on and off for the past three years because their parents have a history of substance abuse. Maternal grandmother told the employee that father had taken A.B. "to his mothers and her paramours [sic]" over the weekend. When A.B. returned, maternal grandmother "noticed the child sexually acting out on a baby doll and asked her what happened which is when the child told her papaw Bob touched her." A police sergeant observed a marijuana pipe and a known drug user in maternal grandmother's home. Maternal grandmother admitted occasionally using marijuana for medical issues outside the children's presence and without a medical marijuana card.

{¶3} The day the complaint was filed, the juvenile court granted the Agency emergency temporary custody, and after a hearing, the court continued temporary custody with the Agency, with visitation as determined by it. On December 7, 2021, the juvenile court issued an entry of adjudication regarding father's rights. The entry indicates that on December 1, 2021, the court conducted a pre-trial hearing at which father appeared but not mother. Father waived his right to a contested adjudicatory hearing, and he admitted that the facts in the complaint were true and that the children were dependent as outlined in the complaint. The court found the children dependent and dismissed the abuse and neglect claims. The court ordered that an adjudicatory hearing be scheduled as to mother and that a dispositional hearing be scheduled as to both parents.

{¶4} On February 3, 2022, the juvenile court issued an entry of disposition regarding father's rights. The entry indicates that on January 19, 2022, the matter came

before the court for a dispositional hearing. Father appeared but not mother. Father waived his right to a contested dispositional hearing. On the agreement of the parties present, the court granted the Agency temporary custody until September 13, 2022, and granted father unsupervised parenting time at his residence for eight hours every Saturday. The court also approved a case plan.

{¶5} Before the juvenile court issued this entry, the Agency evidently filed a second complaint regarding the children under two additional case numbers, and in March 2022, the juvenile court issued an entry in those cases in which it addressed mother's rights, found the children dependent, and granted temporary custody to the Agency until September 13, 2022. The new cases were merged into the original cases. In August 2022, the Agency moved for an extension of temporary custody. With the parents' agreement, the court continued temporary custody with the Agency until March 13, 2023. The court ordered that father's parenting time would be at the Agency's discretion. In February 2023, the Agency moved for a second extension of temporary custody. With the parents' agreement, the court continued temporary custody with the Agency until September 13, 2023. The court granted father unsupervised visits on Sundays from 9 a.m. to 6 p.m.

{¶6} In April 2023, mother and father filed motions for legal custody. On May 26, 2023, the Agency moved for an ex parte order requiring father visit the children at the Highland County Family Advocacy Center ("FAC"). The motion alleged that during an unannounced visit at father's home on May 25, 2023, an Agency employee saw two dog cages "full of dog feces and urine," "dog feces on the floor in several areas, including in

the girls' room," and a "dead dried up reptile in a tank in the living room." The juvenile court granted the Agency's motion.

{¶7}   On June 12, 2023, the court conducted a hearing, and with the agreement of the parties, returned custody to mother with the Agency protectively supervising the placement. With regard to father's visitation time, the court granted him unsupervised, four-hour visits on June 17, 2023, and July 1, 2023, which had to occur at the FAC or in public. If he maintained a sanitary home and the Agency approved, effective July 14, 2023, father would get 24 hours of unsupervised parenting time every other weekend at his residence, and effective August 11, 2023, he would get 48 hours of unsupervised parenting time every other weekend at his residence. The court also ordered that the parents not allow maternal grandmother or three other individuals, all with the first name Robert, to have contact with the children.

{¶8}   On August 18, 2023, the Agency moved for emergency temporary custody. The motion alleged that the Agency received reports that the children had been visiting maternal grandmother, that the children were living in the same home as mother's boyfriend—one of the Roberts named in the June 12, 2023 entry, and that father licked the children and touched A.B.'s nipple over her shirt. The motion alleged that an Agency employee spoke to the children about the allegations, which they essentially confirmed. The juvenile court granted the motion the day it was filed and ordered that there be no contact between the parents and children until further order.

{¶9}   On September 12, 2023, the Agency moved for permanent custody. On November 16, 2023, the children's guardian ad litem ("GAL") filed a report recommending that the juvenile court grant the Agency permanent custody.  In addressing the children's

wishes, the GAL stated that both children indicated to him that "they do not want to visit with their father any more [sic]."

### B. Permanent Custody Hearing

{¶10} On November 16, 2023, the juvenile court conducted the permanent custody hearing. At the beginning of the hearing, the court noted the GAL timely filed his report before the hearing. Mother's counsel told the court that mother would be agreeing to the termination of her parental rights. Also, the assistant prosecutor asked the court to take "judicial notice of the Court's file, findings, entries." The court stated, "All right." Father's counsel did not object.

{¶11} The Agency called five witnesses. First, the Agency called father as if on cross-examination. Father's counsel told the court that he would be advising father to invoke his Fifth Amendment privilege regarding "allegations in the report that may be before the Court today and a possible pending criminal charge." The court stated it had "not read the report" and instructed counsel to "voice your objection if and when you believe it's appropriate." Father testified that he is employed, had lived at his current address for almost two years, and lives with his girlfriend, son, and father. He complied with case plan requirements to do a mental assessment, a drug and alcohol assessment, and follow any recommendations. He did several drug screens for the Agency, and the last positive screen was for marijuana in November 2022. Father admitted that he had a pending criminal damaging charge in municipal court.

{¶12} Father testified that the Clinton County Sheriff's Department interviewed him about allegations regarding his daughters, and no criminal charge had been filed. The assistant prosecutor asked, "You're aware of what the allegations are with regards

to your daughters?" Father said, "Yeah." His counsel objected and stated that he was going to have father "assert his Fifth Amendment." The court stated it would allow the question about whether father was aware of the allegations but not questioning on "any specifics." The assistant prosecutor asked, "You would agree that you under -- you know what the allegations are?" Father testified, "I understand, yeah." The assistant prosecutor stated, "Okay. All right," and then preceded to question father about his lack of a driver's license.

{¶13} Ashley Cremeans, an employee at the Cincinnati Children's Hospital Mayerson Center for Safe and Healthy Children, testified that she performs forensic interviews of children who have disclosed physical and sexual abuse. She testified that forensic interviews are non-leading, non-biased interviews, and at the Mayerson Center, they are performed for the purpose of medical diagnosis and treatment. During a forensic interview, children are instructed to only "talk about things that are true and that really happened" and "not to guess or make anything up." Non-leading, "more open-ended narrative-style questions" are asked so the children "use their own words," and the interviewer does not "put any words into their mouths or direct the interview in any way." Cremeans testified that the Agency referred A.B. and K.H. to the Mayerson Center "due to concerns that they had been licked and bit by a biological parent." On September 15, 2023, she performed forensic interviews of the girls. The Agency introduced Cremeans' reports about the interviews as exhibits, and the court admitted them into evidence.

{¶14} Cremeans testified that A.B. reported that mother licked and whipped her. Specifically, mother would lick her face, forehead, and cheek "as a game" and give "whips on the butt." A.B. told Cremeans that father "would bite and lick her." A.B. "said that it

would be like when they were playing a game that he would bite and lick on her face, and that she didn't like it, and that she would tell him to stop, and that he wouldn't stop when she asked him to do it." A.B. said father "would bite and lick, like, on her cheek and her forehead, and bite on her toes as well." A.B. indicated clothes were on during these events. A.B. recalled her foster mother taking her to a doctor because mother saw "a bite mark on her bad spot," which A.B. identified as her vagina on a female drawing. A.B. did not recall how the bite mark occurred. A.B. also indicated that she had a bruise during the doctor's visit. Cremeans thought A.B. said it was on "her inner thigh" and that the doctor was the only one who saw it. Cremeans did not believe specific testing was ordered for A.B. because the child could not recall a specific incident when father "would have put his mouth on her, like, to cause a bite mark." Cremeans referred A.B. for counseling.

{¶15} Cremeans testified that K.H. told her father "sometimes is mean to her, that he bites and licks her, and he smacks her sometimes." K.H. reported that father "would bite upon her forehead, and her face, her arms, and her belly, and her bad spot." He "would bite on her belly on the side and then pull her pants and underwear down and bite on her bad spot on her -- bite and lick on her bad spot." Cremeans testified that K.H. "was able to articulate that her bad spot is the place she uses the restroom from, and we clarified that that's the place she goes pee from." K.H. said one time father asked her to pull his underwear down, and she did not do so. Father said that "he was going to punish her in the face if she didn't do what he -- what he wanted, and she said he did punch her in the face for not pulling his underwear down." K.H. also reported that father would take her and A.B. to the basement, which had no bathroom, and leave them in the dark. The police were there when they got let out. K.H. also told Cremeans "she recalled an incident

where Dad grabbed a piece of wood," which she described as "like a piece of fence wood," and hit her in the forehead.  K.H. said that "she was bleeding, and she didn't get a Band-Aid for that."  Cremeans did not see any physical marks on K.H.  When asked about when the reported events occurred, Cremeans testified, "I do not know that," but "the things they were telling me were all from visits while they were at Dad's house."  She also testified that "it's very common for kids to have a delay in disclosure."  A doctor referred K.H. for testing for sexually transmitted infection, and Cremeans referred K.H. for counseling.

{¶16}  A FAC employee testified that in February 2023, father "received a violation for roughhousing and horseplay" during a visit with the children based on a review of video footage from the visit.  Father pulled a chair out from under one of the girls, and she fell.  There were "a couple of instances" of "play biting."  During one incident, A.B. said, "Ow, Dad bit me," but father was lying halfway under a train table, so one could not see what happened on the footage.  During another incident, father had his lips over his teeth and was play biting A.B.'s cheek and the back of her head while she sat on his lap.  Father also tried to ride the children like a horse, and they said, "Ow."

{¶17}  An Agency caseworker testified that he had worked for the Agency since June 2021 and became the family's caseworker in July 2023. The caseworker testified that when custody was returned to mother, there was an issue with father getting visitation due to his home conditions. There were roaches in his home.  In addition, the Agency had concerns about there being several litters of puppies in the home during the pendency of the case, and the caseworker was told to monitor the home due to a history of animal feces and urine on the floor.  The caseworker made biweekly visits to father's home.  At

his last visit on October 12, 2023, he observed four dogs plus puppies in the home. He saw about six piles of dog feces on the floor, and feces was in what was supposed to be the girls' bedroom. He also observed "a couple things of animal urine" and smelled a "fairly prominent" odor of "filth" in the home. He saw one dog urinate in a flowerpot in the home which had a tree inside it. The caseworker testified that this visit was not the first time he had seen dog feces in the home even though he had discussed the issue with father. The caseworker also testified that there were still roaches in the home. He acknowledged father completed the case plan but testified that the Agency was still seeking permanent custody due to the home conditions and reports of "biting and licking." The caseworker testified that he visited the children at their foster home at least once a month and that they were "doing well," "get along fine," and "interact pretty well" with the other children. The caseworker had not seen any marks or bruises on them.

{¶18} The children's foster mother testified that she lives with her husband, their four sons, two male foster children, A.B., and K.H. A.B. and K.H. had been in the home for over a year. The children were initially placed with her sometime in 2022, returned to mother for two to three months in 2023, and then placed with the foster mother again. When the girls were first placed with her, the foster mother observed "[a] lot of sexualized behavior with" A.B. A.B. would purposely walk around naked in front of the other children after showering and tried to "sexually act out on" K.H. "a couple of times." A.B. also did not have "safe boundaries" with men. She would "hang on" strangers and try to sit on their laps. The foster mother worked to teach her about body safety, and A.B.'s behavior had improved. The foster mother testified that when the girls were placed with her the second time, they seemed "kind of shut down." The foster mother testified that K.H. "does

pretty good" in school. A.B. "was behind when she started" and "struggles a little bit," and the foster mother had been working with her on "reading and things." The foster mother testified that she is very bonded with the girls. The girls fit in well at her home, "are very comfortable" there, and get along with the other children. They participate in family gatherings and vacations. If the Agency received permanent custody of the girls, she and her husband were interested in adopting them.

{¶19} During closing arguments, father's counsel asked the juvenile court to not consider the GAL's report "since it was not offered as an exhibit," and "[t]here was no testimony that that in fact was [his] report." The GAL told the court: "As to the report, I guess I'll leave that up to the Court and the parties. I did prepare a report; did file the said report." The GAL told the court that he recommended granting permanent custody to the Agency. After closing arguments, mother told the court that it was in the children's best interest to terminate her parental rights and that she was voluntarily agreeing to a grant of permanent custody to the Agency.

### C. Permanent Custody Decision

{¶20} The juvenile court granted the Agency permanent custody of the children. The court found that the children had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. The court then stated it would next "analyze the 'best interest' issue" and that "[i]n addition to the sworn testimony, admitted exhibits, pleadings, and argument of counsel," it had "considered the factors enumerated within O.R.C. 2151.414(D)(1)(a-e)." But before conducting its best interest analysis, the court made several statements summarizing the facts. The court stated, "It is initially important to note that on December 7, 2021, the father admitted all facts as alleged within

the complaint filed September 13, 2021, were true and that both of his children were Dependent." The court stated that "[p]art of those admitted facts were that the oldest child, A.B., * * * had stated the paternal grandfather (Bob) had touched her monkey with his monkey." The court noted that it was "of concern to the Court" that the caseworker "testified the paternal grandfather was living in" father's home.[1] After summarizing Cremeans' testimony, the court stated: "It is important to note that when provided the opportunity to testify and deny all allegations made by the two girls the father elected not to do so or present any evidence in opposition to the Permanent Custody motion."

{¶21} The court made findings regarding the statutory best interest factors, including that the children had "an appropriate interrelationship and interaction with their foster family" and "that biting and licking children, as the father and mother did in this case, is not an appropriate interaction or behavior." The court found that "[h]aving been removed from the physical custody of both parents since September 13, 2021," except for an approximately two-month period, the children needed a legally secure placement which could not be accomplished without a grant of permanent custody to the Agency. The court stated: "It is hard to understand why the father in this case has refused to provide a home environment for his children that is safe and sanitary." The court stated: "Roaches, feces and urine within his home as recently [as] October 12, 2023 (twenty-

---

[1] We observe that the complaint identified the person A.B. made the monkey statement about as "papaw Bob (paternal)." The complaint later indicated A.B. made the statement after father had taken her to "his mothers and her paramours [sic]." In the June 12, 2023 entry, the juvenile court ordered the parents to not allow three individuals with the first name Robert to have contact with the children. It is unclear whether one of them was "papaw Bob." At the permanent custody hearing, the Agency caseworker said the paternal grandfather's name during his testimony. The first name given was not Robert or Bob, and the last name given does not match the last name of any of the Roberts in the June 12, 2023 entry. Therefore, it appears the person A.B. made the monkey statement about may have been paternal grandmother's boyfriend, not paternal grandfather. However, father does not raise this issue on appeal, and in any event, the permanent custody decision does not indicate the court factored its "concern" about paternal grandfather living with father into its best interest analysis.

three months after removal of the children) certainly sends a clear message to this Court that the father is not willing or able to provide a safe and sanitary environment for his children, or a legally secure permanent placement." The court gave "a great deal of weight to the statements of the children during their forensic interview." The court stated: "Licking and biting children on various body locations, including but not limited to [K.H.'s] bad spot is under any circumstance inappropriate if not criminal." The court found "the statements of both children credible, admissible and obtained under the standards of" *State v. Muttart*, 2007-Ohio-5267. The court noted the GAL recommended the court grant the Agency's motion, and none of the parties "elected to cross-examine the [GAL] on his opinion." The court found it was in the best interest of the children to grant the Agency permanent custody.

## II. ASSIGNMENT OF ERROR

{¶22} Father presents one assignment of error: "The trial court's grant of permanent custody to the [Agency] is against the manifest weight of the evidence as the grant was not based upon competent, credible evidence."

## III. LAW AND ANALYSIS

### A. Standard of Review

{¶23} "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence." *In re C.S.*, 2019-Ohio-5109, ¶ 21 (4th Dist.). We have explained:

> "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." [*In re T.J.*,

2016-Ohio-163, ¶ 25 (4th Dist.)], citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.  In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record.  *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

In a permanent custody case the dispositive issue on appeal is "whether the trial court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1).   "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14.   "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

(First alteration added.)  *Id.* at ¶ 21-22.

{¶24}  Although father's assignment of error asserts a manifest weight challenge, his arguments raise questions of law about what a juvenile court may consider in its best interest analysis and whether a factfinder may evaluate the credibility of hearsay evidence.  "We review questions of law de novo."  *Whitesed v. Huddleston*, 2021-Ohio-2400, ¶ 18 (4th Dist.).

## B.  Statutory Framework

{¶25}  Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody to a public children services agency if the court determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) apply, and (2) it is in the best interest of the child.  In this case, the juvenile court found that R.C. 2151.414(B)(1)(d) applied, i.e., the children had "been in the temporary custody of one or

more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *."   Father does not dispute that the children were in the temporary custody of the Agency for the requisite time; therefore, we must affirm the permanent custody award unless the juvenile court's best interest determination is against the manifest weight of the evidence.

{¶26}  R.C. 2151.414(D)(1) states:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

* * *

Pertinent to father's arguments, R.C. 2151.414(E)(11) states:

The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

C.  Cleanliness of Father's Home

{¶27}  Father contends the juvenile court improperly considered the cleanliness of his home in its best analysis.  Father asserts that the cleanliness of a parent's home is not a statutorily enumerated best interest factor.  He acknowledges R.C. 2151.414(D)(1) states that in determining a child's best interest, the court "shall consider all relevant factors, including, but not limited to," the enumerated ones.  But he claims "relevant" means "closely connected," so "there are limitations to what can be considered relevant." Father asserts that the "all relevant factors" phrase "must be read *in pari materia*, meaning 'on the same subject' or 'in a similar case,' with the factors that are set forth in the Revised Code, otherwise, there can be no limit to what a trial court may consider in terminating parental rights."  He relies on *Stiner v. Amazon.com, Inc.*, 2020-Ohio-4632, to support his position.

{¶28}  Father maintains that none of the enumerated best interest factors "speak to home cleanliness" except R.C. 2151.414(E)(11).  He suggests home cleanliness falls under a parent's ability to provide "adequate care for the health, welfare, and safety of the child."  However, he asserts R.C. 2151.414(E)(11) is not applicable because it "requires a predicate termination of parental rights before it can be considered."  And he asserts that because R.C. 2151.414(E)(11) refers to both a "legally secure permanent placement" and "adequate care for the health, welfare, and safety of the child," the phrase "legally secure permanent placement" as used in that provision and R.C. 2151.414(D)(1)(d) does not include home cleanliness. Therefore, he claims the juvenile court should not have considered home cleanliness because it "is not relevant * * * under the catchall phrase

rule of law," so the court "relied upon irrelevant evidence, which is incompetent evidence, to terminate [his] parental rights."

{¶29} The juvenile court properly considered the cleanliness of father's home in addressing the children's need for a legally secure permanent placement. The Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). We have stated: "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.* The cleanliness of a parent's home bears on his or her ability to provide such an environment.

{¶30} Even if we agreed with father that cleanliness of a parent's home is irrelevant to a parent's ability to provide a "legally secure permanent placement," the juvenile court appropriately considered the cleanliness of father's home under R.C. 2151.414(D)(1)'s catchall phrase because it is relevant to the best interest of the children. *Stiner* is inapposite. In that case, the Supreme Court of Ohio considered the definition of a supplier under the Ohio Products Liability Act. *Stiner*, 2020-Ohio-4632, at ¶ 1. Under R.C. 2307.71(A)(15)(a)(i), a supplier includes "[a] person that, in the course of a business conducted for the purpose, sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce." The Supreme Court explained the phrase "otherwise participates in the placing of a product in the stream of commerce" is a catchall phrase. *Stiner* at ¶ 16. The Supreme Court

stated: "The phrase 'otherwise participates' signifies that the catchall phrase must be read in conjunction with the preceding list of specific actions that may subject a supplier to liability."  *Id.* at ¶ 15.  The Supreme Court further stated:  "When, as here, a statute contains a list of specific terms followed by a catchall term linked to the previous list, 'we consider the catchall term as embracing only things of a similar character as those comprehended by the preceding terms.' "  *Id.*, quoting *Fraley v. Estate of Oeding*, 2014-Ohio-452, ¶ 23.  " 'When the initial terms all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage.' "  *Id.*, quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012).  Applying this rule, the Supreme Court found that the catchall phrase in R.C. 2307.71(A)(15)(a)(i) "embraces conduct of a similar character as the sale, distribution, lease, preparation, blending, packaging or labeling of a product.  All the specified actions involve some act of control over a product or preparation of a product for use or consumption."  *Id.* at ¶ 16.

{¶31} Unlike R.C. 2307.71(A)(15)(a)(i), R.C. 2151.414(D)(1) does not contain a list of specific items followed by a catchall phrase linked to the previous list.  R.C. 2151.414(D)(1) begins with a mandate that courts consider "all relevant factors" in determining the best interest of a child.  The statute then gives a non-exhaustive list of relevant factors.  The statute in no way indicates that the phrase "all relevant factors" embraces only things of a similar character as those comprehended by the enumerated factors.  The only limit on what a court can consider in its best interest analysis is that any considered factor must be "relevant" to the child's best interest.  Even using the definition

of "relevant" in father's appellate brief, it is evident that the cleanliness of father's home is "closely connected" to the best interest of his children.

{¶32} For the foregoing reasons, we reject the contention that the juvenile court erred when it considered the cleanliness of father's home in its best interest analysis.

### D. Credibility of the Children's Interview Statements

{¶33} Father also challenges the juvenile court's finding that the children's statements during their forensic interviews were "credible, admissible and obtained under the standards of" *Muttart*. Father does not dispute that the statements were obtained under the standards of *Muttart* and admissible. However, he contends that *Muttart* holds that "the reports are admissible evidence," not that the statements in them "can be found to be credible." He asserts that the only thing a factfinder may find credible is "the testimony of witnesses" and that we "need not give deference" to the juvenile court's finding because the court "was not situated to view the children and to observe their demeanor, gestures, and voice inflections and to use those observations to weigh credibility which is the reason for a reviewing court's deference" to witness credibility determinations. Father maintains that when the juvenile court found the children's statements credible, it "mistook" them "as testimony," and its credibility finding "was based upon an incorrect rule of law" because "credibility goes to testimony and weight goes to the other evidence." Father claims the children's statements "cannot be credible or not credible. They have or do not have weight." Therefore, he asserts that the juvenile court terminated his parental rights "using the wrong legal standard." He further asserts that "there is no testimony as to the abuse of the children," so the juvenile court's "finding is based upon incompetent evidence, the non-existent testimony of the two children."

**{¶34}** " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). Generally, hearsay statements are excluded from evidence " 'because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of [the] statements; the declarant's word is not subject to cross-examination; and [the declarant] is not available in order that his [or her] demeanor and credibility may be assessed' by the trier of fact." *State v. Wesson*, 2013-Ohio-4575, ¶ 60, quoting *Chambers v. Mississippi,* 410 U.S. 284, 298 (1973). But there are exceptions. *See* Evid.R. 802.

**{¶35}** "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" "are not excluded by the hearsay rule, even though the declarant is available as a witness." Evid.R. 803(4). "[A] fundamental assumption underlying the medical-treatment exception is that that particular hearsay is reliable." *Muttart*, 2007-Ohio-5267, at ¶ 39, citing *State v. Dever*, 64 Ohio St.3d 401, 410-411 (1992). "At common law, the exception was based largely on the 'selfish-motive doctrine,' i.e., the belief that the declarant is motivated to speak truthfully to a physician because of the patient's self-interest in obtaining an accurate diagnosis and effective treatment." *Id.* at ¶ 34, citing *State v. Eastham*, 39 Ohio St.3d 307, 312 (1988) (Brown, J., concurring). The exception "is also premised on the professional-reliance factor." *Id.* at ¶ 40. " ' "The general reliance upon 'subjective' facts by the medical profession and the ability of its members to evaluate the accuracy of statements made to them is

considered sufficient protection against contrived symptoms.    Within the medical profession, the analysis of the rule appears to be that facts reliable enough to be relied on in reaching a diagnosis have sufficient trustworthiness to satisfy hearsay concerns." ' ' " *Id.* at ¶ 41, quoting *Dever* at 411, quoting 2 *McCormick on Evidence* 250 (4th Ed.1992).

{¶36}  In *Muttart*, the Supreme Court of Ohio considered "whether a child's out-of-court statements to medical personnel are admissible pursuant to Evid.R. 803(A) in the absence of a judicial determination of the competency of the child as a witness."  *Id.* at ¶ 2.  The Supreme Court held:  "Regardless of whether a child less than ten years old has been determined to be competent to testify pursuant to Evid.R. 601, the child's statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) if they were made for purposes of medical diagnosis or treatment."  *Id.* at syllabus.  The Supreme Court explained:  "In cases in which a statement was made for purposes of medical diagnosis or treatment, the question is not whether the statement is reliable; the presumption is that it is."  *Id.* at ¶ 47.  "The salient inquiry here is not [the child's] competency but whether [the child's] statements were made for purposes of diagnosis and treatment rather than for some other purpose."  *Id.*  "The trial court's considerations of the purpose of the child's statements will depend on the facts of the particular case."  *Id.* at ¶ 49.  However, they include:  (1) "whether the child was questioned in a leading or suggestive manner," (2) "whether there is a motive to fabricate, such as a pending legal proceeding such as a 'bitter custody battle,' " and (3) "whether the child understood the need to tell the physician the truth."  *Id.*, quoting *Dever* at 410.  "In addition, the court may be guided by the age of the child making the statements, which might suggest the absence or presence of an ability to fabricate, and the consistency of [the child's]

declarations." (Footnote omitted) *Id.* "[T]he court should be aware of the manner in which a physician or other medical provider elicited or pursued a disclosure of abuse by a child victim, as shown by evidence of the proper protocol for interviewing children alleging sexual abuse." *Id.*

**{¶37}** The juvenile court did not err when it found the children's interview statements "credible" after admitting them into evidence. It is true that *Muttart* focuses on the admissibility of hearsay statements under Evid.R. 803(4), not whether a factfinder may find such statements "credible." It is also true that courts often discuss credibility in the context of witness testimony. *See, e.g., State v. Chafin*, 2017-Ohio-7622, ¶ 32 (4th Dist.) ("The trier of fact is free to believe all, part, or none of the testimony of any witness, and we defer to the trier of fact on evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility"). However, this does not mean the juvenile court erred in stating it found the children's interview statements "credible" instead of stating that they "have or do not have weight."

**{¶38}** "Credibility" is "[t]he quality that makes something (as a witness *or some evidence*) worthy of belief." (Emphasis added.) *Black's Law Dictionary* (11th Ed. 2019). "Credible evidence" is "[e]vidence that is worthy of belief; trustworthy evidence." *Id.* The Supreme Court of Ohio has stated:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990). Moreover, the Supreme Court of Ohio has stated that once a court admits hearsay statements pursuant to Evid.R. 803(4), "their credibility is a matter to be evaluated by the factfinder." *Dever*, 64 Ohio St.3d at 412. Therefore, the juvenile court did not err in evaluating the credibility of the children's statements to decide what weight to assign them.

**{¶39}** Father asserts that we need not defer to the juvenile court's credibility finding; however, he does not present any argument as to how the children's statements were untrustworthy or unworthy of belief. The juvenile court's credibility finding is supported by the fact that the children reported some similar types of conduct by father— biting and licking—in separate interviews and evidence that father engaged in biting-related behavior during a visit with the children. Moreover, there is no evidence they had a motive to fabricate their statements.

**{¶40}** For the foregoing reasons, we find no error in the juvenile court's finding that the children's interview statements were credible.

### E. Fifth Amendment Right Against Self-Incrimination

**{¶41}** Father claims that after he invoked his Fifth Amendment right against self-incrimination, the juvenile court improperly used his silence against him. Father maintains that "[a] court may not compel a parent's admission to a crime in custody proceedings, if the admission could be used against the parent in a subsequent criminal proceeding, under the threat of losing parental rights." Father also asserts that in a civil case, the State must "offer a witness protection from the use of compelled statements or evidence in a subsequent criminal investigation before using the testimony." He asserts that

"neither the state nor the trial court offered [him] protection from the use of any compelled statements and any evidence derived from those answers in a subsequent criminal investigation * * *." Therefore, he asserts that "[t]he trial court was not permitted to use [his] silence against him," and "[t]o hold otherwise would be to abolish the Fifth Amendment in permanent custody cases as a trial court would be able to force parents to confess to say almost anything to keep their children." And he asserts that without his silence, "it cannot be stated that there remains sufficient evidence to warrant affirming the trial court's grant of permanent custody to the [Agency]."

{¶42} The underlying premise of father's argument—that the juvenile court used his silence as a ground for terminating his parental rights—is incorrect. In its permanent custody decision, the juvenile court did state, "It is important to note that when provided the opportunity to testify and deny all allegations made by the two girls the father elected not to do so or present any evidence in opposition to the Permanent Custody motion." However, when the juvenile court analyzed the best interest factors, it made no mention of father's silence. The court did give "a great deal of weight" to the children's interview statements, which it found "credible." However, the court did not indicate it found the children credible because of father's silence. And as we noted above, the juvenile court's credibility finding is supported by the fact that the children reported some similar types of conduct by father—biting and licking—in separate interviews, evidence that father engaged in biting-related behavior during a visit with the children, and the absence of evidence that the children had a motive to lie.

{¶43} Even if the juvenile court had made an adverse inference against father based on his refusal to testify about the allegations against him, father has not shown the

court erred in doing so.  The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." "This protection exists primarily to 'assure that an individual is not compelled to produce evidence which may later be used against him as an accused in a criminal action.' " *Cincinnati v. Bawtenheimer*, 63 Ohio St.3d 260, 264 (1992), quoting *Maness v. Meyers*, 419 U.S. 449, 461 (1975).  " 'The Amendment not only protects the individual against being involuntarily called as a witness against himself [or herself] in a criminal prosecution but also privileges [the individual] not to answer official questions put to [the individual] in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him [or her] in future criminal proceedings.' " *State v. Gideon*, 2020-Ohio-6961, ¶ 8, quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).

{¶44}  "The normal rule in a criminal case is that no negative inference from the defendant's failure to testify is permitted."  *Mitchell v. United States*, 526 U.S. 314, 327-328 (1999).  However, the United States Supreme Court "has recognized 'the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them,' *Baxter v. Palmigiano*, 425 U.S. 308, 318 * * * (1976), at least where refusal to waive the privilege does not lead 'automatically and without more to [the] imposition of sanctions,' *Lefkowitz v. Cunningham*, 431 U.S. 801, 808, [fn.] 5, * * * (1977)."  (Bracketed text in original.)  *Mitchell* at 328.

{¶45} Father's refusal to waive his right against self-incrimination did not lead automatically and without more to the termination of his parental rights.  Under R.C. 2151.414(D)(1), in determining the best interest of the children, the juvenile court had to

consider "all relevant factors, including, but not limited to," the enumerated ones.  The juvenile court's permanent custody decision reflects that it complied with R.C. 2151.414(D)(1), and its best interest determination was not based solely on any adverse inference drawn from father's silence.

**{¶46}** Permanent custody proceedings undoubtedly differ from ordinary civil actions.  However, father does not direct us to any legal authority which stands for the proposition that a court may not make an adverse inference against a parent who refuses to testify in response to probative evidence offered against them in a permanent custody hearing and consider that inference, along with other relevant factors, in making a best interest determination, unless the parent is first offered protection from the use of his statements in a criminal investigation.  Instead, father directs us to *In re A.S.*, 2019-Ohio-4268, ¶ 27 (5th Dist.), for the propositions that the Fifth Amendment applies in criminal and civil proceedings, prohibits the State from compelling testimony in a civil proceeding which may incriminate the witness in a future criminal proceeding, and that compulsion "arises whenever some penalty is imposed for failing to offer testimony."  And he directs us to *In re A.D.*, 2023-Ohio-2442, ¶ 76 (3d Dist.) for the propositions that a communication must be testimonial, incriminating, and compelled to qualify for Fifth Amendment protection, that a communication must explicitly or implicitly relate to a factual assertion or disclose information to be testimonial, and that "[a] court may not compel a parent's admission to a crime in custody proceedings, if the admission could be used against the parent in a subsequent criminal proceeding, under the threat of losing parental rights."  Neither of these cases involves a court making an adverse inference against a parent for

refusing to testify during a permanent custody hearing.  *See In re A.S.* at ¶ 28; *In re A.D.* at ¶ 77.

**{¶47}** Father also quotes several passages from *In re Amanda W.*, 124 Ohio App.3d 136 (6th Dist. 1997), and a paragraph summarizing that case in *In re Harmon*, 2000 WL 1424822 (4th Dist. Sept. 25, 2000).  In *In re Amanda W.*, the child was "removed from her home because she disclosed that her father 'touches her private parts and puts his private parts in her.' "  *In re Amanda W.* at 138.  The parents substantially complied with their case plans, but while they recognized the child had been abused, they "persistently denied" that the father was the perpetrator.  *Id.* at 139.  As a result, the father "was not permitted to participate in group counseling for sexual offenders as set forth in his case plan."  *Id.*  The juvenile court granted permanent custody to an agency on the grounds that the child could not and should not be placed with her parents within a reasonable time and that an award of permanent custody to the agency was in the child's best interest.  *Id.* at 139.  The parents appealed and presented two assignments of error asserting that the grant of permanent custody violated the father's Fifth Amendment right against self-incrimination and that the manifest weight of the evidence did not support the grant of permanent custody.  *Id.* at 140.  The appellate court found the assignments of error well-taken and reversed.  *Id.* at 141, 143.

**{¶48}** The appellate court explained that even though the parents did not expressly invoke the right against self-incrimination at the trial level, "if the state, expressly or by implication, imposes a penalty for the exercise of the privilege, the failure to assert the privilege is excused."  *Id.* at 140.  The court found "an implicit, and potent, penalty for failure to satisfy the requirements of a particular case plan is the loss of a parent's

fundamental liberty right to the care, custody, and management of his or her child." *Id.* at 141. And the court found the parents "were made fully aware of the fact that the 'failure to admit' would lead to the imposition of this penalty." *Id.* The court stated: "In our opinion, this is the type of compelling sanction that forces an individual to admit to offenses in violation of his right not to incriminate himself." *Id.* Thus, "the privilege was self-executing," and "to avoid a Fifth Amendment infringement," the State had to offer the parents "protection from the use of any compelled statements and any evidence derived from those answers in a subsequent criminal case against either one or both of them." *Id.* It did not do so. *Id.*

**{¶49}** The appellate court also explained that the juvenile court found the child could not be placed with her parents within a reasonable time or should not be placed with them under a prior version of R.C. 2151.414(E)(1), which stated:

> Following the placement of the child outside his home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside his home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purposes of changing parental conduct to allow them to resume and maintain parental duties.

*Id.* at 142. The appellate court stated it was "undisputed" that the parents "attempted to substantially remedy the condition that caused [the child] to be removed from their home." *Id.* "The sole area of noncompliance was the failure of the parents to admit that [the father] sexually abused his daughter." *Id.* "The only way the parents could fully comply with the case plan was to expose themselves to potential criminal prosecution. If they did

not comply, they would lose custody of their child." *Id.* Therefore, the way the agency "handles situations where a parent is accused of sexually abusing his or her child creates a 'Hobson's Choice' wherein any choice made by the parent results in adverse consequences." *Id.* As a result, where the agency "believes that a parent sexually abused his or her child, [it] must make reasonable and diligent efforts to offer a case plan for treatment of the alleged sexual offender while protecting his or her individual rights." *Id.* Because the agency did not do so, the appellate court "reluctantly" found the juvenile court's judgment was not supported by clear and convincing evidence. *Id.*

{¶50} *In re Amanda W.* is inapposite. *In re Amanda W.* did not involve a court making an adverse inference against a parent for refusing to testify during a permanent custody hearing. It involved a requirement that a parent admit to abusing his daughter to participate in group counseling for sex offenders as required by a case plan. In this case, father was not subjected to any such requirement and in fact completed his case plan. And even if the juvenile court made an adverse inference against father based on his refusal to testify about the allegations against him, as noted above, his refusal to waive his right against self-incrimination did not lead automatically and without more to the termination of his parental rights.

{¶51} Father's failure to direct our attention to pertinent legal authority is fatal to his Fifth Amendment claim. An appellant must support an assignment of error "with arguments and supporting law." *McCann v. Webb*, 2022-Ohio-2318, ¶ 7 (4th Dist.). If legal authority exists to support father's Fifth Amendment claim, "it is not our duty to root it out." *State v. Alexander*, 2022-Ohio-1812, ¶ 34 (4th Dist.).

F. Best Interest of the Children

### 1. Interactions and Interrelationships of the Children

**{¶52}** There is evidence to support the juvenile court's finding that the children have appropriate interrelationships and interactions with their foster family and had inappropriate interactions with father. An Agency caseworker testified that he visited the children at their foster home and that they were doing well there and interacted well with other children in the home. The children's foster mother testified about the bond between the girls and her family and her efforts to teach A.B. about body safety after the child exhibited sexualized behavior. As the juvenile court pointed out, there was evidence that father bit and licked the children. The children made statements to this effect, and the FAC employee testified about father's biting-related behavior during a visit with the children.

### 2. Wishes of the Children

**{¶53}** R.C. 2151.414(D)(1)(b) requires consideration of "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." The wishes of the children were expressed through their GAL in his November 16, 2023 report—the children did not want to visit father anymore. At the beginning of the permanent custody hearing, the juvenile court granted the Agency's request to take "judicial notice" of the court file, which includes this report. Father's counsel did not object at that time and instead waited until closing arguments to ask the juvenile court to not consider the GAL's report. In the permanent custody decision, the court did not explicitly state that it considered the children's wishes as expressed in the GAL's report. However, the court stated that it had "considered the factors enumerated within O.R.C. 2151.414(D)(1)(a-e)," and to consider R.C.

2151.414(D)(1)(b), the court had to consider the statement in the GAL's report about the children's wishes.

### 3. Custodial History

{¶54} The children have been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1) states that for purposes of that provision, "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." In this case, the earlier date is 60 days after the removal of the children, November 12, 2021. The children were in the Agency's temporary custody until June 13, 2023, when custody was returned to mother with the Agency protectively supervising the placement. The court returned temporary custody to the Agency on August 18, 2023. The children have been in the Agency's temporary custody since then.

### 4. Legally Secure Permanent Placement

{¶55} As previously stated, the Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

{¶56} Evidence supports the juvenile court's finding that a legally secure permanent placement could not be achieved without a grant of permanent custody to the

Agency.  Mother consented to the termination of her parental rights.  Although father did not and completed his case plan, "we have observed many times in the past" that "a parent's case plan compliance may be a relevant, but not necessarily conclusive, factor when a court considers a permanent custody motion."  *In re E.R.*, 2023-Ohio-1468, ¶ 45 (4th Dist.)  " 'Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best interest, "it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights." ' "  *Id.*, quoting *In re W.C.J.*, 2014-Ohio-5841, ¶ 46 (4th Dist.), quoting *In re Gomer*, 2004-Ohio-1723, ¶ 36 (3d Dist.).  "Thus, a parent's case plan compliance will not preclude a trial court from awarding permanent custody to a children services agency when doing so is in the child's best interest."  *In re E.R.* at ¶ 45.

{¶57}  The statements the children made in their forensic interview indicate that father engaged in inappropriate conduct with them, and evidence supports the juvenile court's finding that father "refused to provide a home environment for his children that is safe and sanitary."  The family's caseworker observed roaches, feces, and urine in father's home as recently October 12, 2023. The juvenile court indicated that was 23 months after the children's removal, but it was almost 25 months.  Although father's counsel urged the court to give father time to get the home clean, "the permanent custody statutes do not contemplate leaving children in custodial limbo for an extended period of time while a parent attempts to establish that the parent can provide the child with a legally secure permanent placement."  *In re Z.M.*, 2019-Ohio-2564, ¶ 34 (4th Dist.).  "[K]eeping children in limbo is not in their best interests."  *Id.*  Moreover, there is evidence that if the

Agency has permanent custody, the children's foster parents, with whom the children have been doing well, are interested in adopting them.

### 5.  Factors in R.C. 2151.414(E)(7) to (E)(11)

**{¶58}** The juvenile court did not find R.C. 2151.414(E)(7) to (E)(11) applied. Nothing in the parties' briefs or record indicates they are applicable to this case.

### 6.  Conclusion

**{¶59}** The juvenile court's best interest finding is not against the manifest weight of the evidence.  The Agency presented competent and credible evidence upon which the court reasonably could have formed a firm belief that a grant of permanent custody to the Agency was in the best interest of the children.  Accordingly, we conclude that the permanent custody award is not against the manifest weight of the evidence, overrule the sole assignment of error, and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
       Michael D. Hess, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**