[Cite as *State v. Kimbrough*, 2026-Ohio-1706.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 25CA13 |
| Plaintiff-Appellee, | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| v. | : | |
| Sterling L. Kimbrough, | : | |
| | | **RELEASED 5/6/2026** |
| Defendant-Appellant. | : | |

_____
<u>APPEARANCES</u>:

Karyn Justice, Esq., The Law Office of Karyn Justice, LLC, Portsmouth, Ohio, for appellant.

Brigham M. Anderson, Lawrence County Prosecuting Attorney, and Andrea M. Kratzenberg, Lawrence County Assistant Prosecuting Attorney, Ironton, Ohio, for appellee.
_____
Hess, J.

**{¶1}** Sterling L. Kimbrough appeals from a judgment of the Lawrence County Common Pleas Court convicting him, following a bench trial, of aggravated trafficking in drugs with a major drug offender specification. Kimbrough presents two assignments of error asserting that the trial court erroneously denied his motion for a new trial and that his "convictions are against the manifest weight and sufficiency of the evidence." For the reasons which follow, we overrule the assignments of error and affirm the trial court's judgment.

## I.  FACTS AND PROCEDURAL HISTORY

**{¶2}**   In September 2024, Kimbrough was indicted on one count of aggravated trafficking in drugs (methamphetamine) in violation of R.C. 2925.03(A)(2) and (C)(1)(f), and one count of aggravated possession of drugs (methamphetamine) in violation of R.C. 2925.11(A) and (C)(1)(e), both first-degree felonies. Each count had a major drug offender specification. The matter proceeded to a bench trial.

### A.  Testimony of Patrolman Hutchinson

**{¶3}**   Patrolman Layman Hutchinson[1] testified that on Wednesday, August 14, 2024, he was working for the Hanging Rock Police Department when he initiated a traffic stop around 12:30 a.m. due to speeding and a marked lanes violation. There were three males in the vehicle: (1) the driver and registered owner of the vehicle, Tarence Arrington; (2) a front seat passenger, Quesean Branner; and (3) a back seat passenger, Kimbrough. When Patrolman Hutchinson approached the vehicle, he immediately smelled a strong odor of burnt marijuana, and he saw what looked like burnt marijuana roaches in the center console. He asked Arrington to exit the vehicle. Arrington admitted they smoked marijuana in the vehicle around Bowling Green, Ohio. Patrolman Hutchinson asked if there was anything else illegal in the vehicle, and Arrington paused for a second, looked nervous, looked at the vehicle, shrugged, and said, "I don't know.  There shouldn't be.  I don't have anything in my bags.  You can search my bags and the vehicle if you want."

**{¶4}**   Arrington said they were traveling from Detroit, Michigan, to Huntington, West Virgina, to see his brother who attends Marshall University.  Arrington was going to stay with his brother at a residence on Charleston Avenue and leave early Friday morning.

---

[1] Although the transcript indicates Patrolman Hutchinson's first name is "Layman," some documents in the record indicate it is "Landon."

Branner said they were going to Huntington to visit friends and indicated they were coming right back. Kimbrough claimed he was going to Huntington to start a new life but did not bring any bags. When asked how he planned to get clothes, Kimbrough said his mother was going to CashApp him money for clothing and other things. Arrington also said Kimbrough was going to Huntington to start a new life.

{¶5} Patrolman Hutchinson found several bags in the trunk. Arrington immediately took ownership of two bags, one which contained a digital scale with marijuana residue on it. Branner took ownership of two bags. One bag just contained clothes, and Patrolman Hutchinson could not recall if he checked the size of the clothing. The other bag had colored packs in it containing what Branner admitted was marijuana. There was a fifth bag no one took ownership of which had a crystalline substance inside it weighing 445.25 grams (plus or minus .09 grams) which contained methamphetamine, and medium shirts. There was a sixth bag in the back seat or trunk which contained gallon-sized bags which contained 3-5 pounds of a green leafy substance believed to be marijuana.

{¶6} Arrington was a "bigger man," "about 400 and some pounds," and "[c]ouldn't wear a medium." Branner was the smallest of the three men, "very skinny and slim," and said he "typically" wears a small but could sometimes wear a medium. Kimbrough said he wears large shirts. Patrolman Hutchinson looked at the size of the shirt Kimbrough had on, and it was a medium. The three men were arrested, and Patrolman Hutchinson seized all cell phones in the vehicle.

{¶7} Patrolman Hutchinson testified that he found cash during the traffic stop, that he counted it at his office and wrote the amount on the outside of the evidence bag

containing it, and that the bag was in an evidence locker in the patrol room.  However, he did not photograph the cash or document it in his report. He might have documented it on a notepad, but if he did, he did not give it to the State. To his knowledge, the evidence was not turned over to the defense.  He did not recall how much cash was seized. But he believed it was over $1,000 and came from "all of them." He agreed if Kimbrough had money on him, that made the fact that he was traveling without clothes less problematic.

### B.  Testimony of Patrolman Birch

**{¶8}**   Patrolman Charles Birch testified that on August 14, 2024, he worked for the Coal Grove Police Department and assisted with the traffic stop. He wore a body camera, and the footage was played by the State during direct examination. On cross-examination, Patrolman Birch acknowledged the footage showed him taking cash from Kimbrough. Patrolman Birch testified that he did not count it, but Kimbrough told him "there was about a 100 and something dollars in cash."  Patrolman Birch testified that he put the cash on a seat in Patrolman Hutchinson's cruiser and did not know what happened to it afterwards.  On the footage, a few minutes after putting cash and other items on the seat, Patrolman Birch says, "All his property is right there.  He said he had about 100 and something dollars worth of cash on him." Patrolman Birch also testified that he heard Patrolman Hutchinson say the clothes in a bag Branner took ownership of were medium.

### C.  Testimony of Investigator Chaffins

**{¶9}**   Investigator Bryan Chaffins of the Lawrence County Prosecutor's Office testified that he is assigned to the drug task force and assisted with the investigation in this case.  He conducted recorded interviews of Kimbrough, Arrington, and Branner, and the State played the interview of Kimbrough at trial. At one point when Patrolman

Hutchinson is present, he says, "You said you didn't have any money, so how'd you plan on . . . ." Kimbrough says, "I told you. You took a hundred and twenty some dollars off of me, and I had Zelle and CashApp."

{¶10} Investigator Chaffins reviewed data from the seized phones and recorded jail calls involving James Mathis, who was incarcerated in Detroit and being extradited to Huntington soon, Arrington, Branner, Mathis's significant other, Tritney Boner, and at times, Kimbrough. Investigator Chaffins learned Mathis "left a sizeable amount of narcotics in Dunbar," West Virginia, needed people to take over his West Virgina narcotics business, and was sending Arrington, Branner, and Kimbrough to assume those roles. He learned from Arrington's phone that the trip destination was not Charleston Avenue as he had been told. The first destination was 18th Street in Dunbar, West Virginia, where Boner lived, to pick up drugs. The second destination was Hublee Road in Lenore, West Virginia, where a woman named Wendy lived and where the drugs were supposed to be delivered. He told another officer about the drugs, and on August 15 or 16, 2024, that officer seized about an ounce of fentanyl and over 100 grams of methamphetamine from the Dunbar location. Investigator Chaffins was not present when the drugs were found; his knowledge of the seizure came from the other officer and that officer's report.

{¶11} Investigator Chaffins did not find any useful information on Kimbrough's phone, but Arrington's contained messages exchanged between his phone number and Kimbrough's phone number, which we will set forth verbatim. On August 4, 2024, i.e., about ten days before the traffic stop, Arrington said, "How it's looking?" Kimbrough said, "I'm waiting on him to pull down or send me the lo I was gone have you look at it too but fuxk it we'll see." Arrington said, "You heard about baby jay?" Kimbrough said, "Nah what

happened?" Arrington said, "He got loxked up with pole last night." Kimbrough said, "Smfh," and "We waiting on him to get out or mfs shooting back out?" Arrington said, "Im tryna see wassup." Kimbrough said, "Sheesh lmk," and then, "Gang you sliding back tonight?" Arrington said, "I Kant i got a doctor appointment tomorrow at 10." On August 5, 2024, Kimbrough said, "Bet gone jump on the hound, fuck around and over slept pop left." Arrington said, "See wassup with ya mans first." Kimbrough said, "Who." Arrington said, "With the checks," and "I got a damn warrant out for my arrest because I forgot I had kourt on Friday." Kimbrough said, "SMH wtf." Arrington said, "I know. It just went out today." Kimbrough said, "What they saying." Arrington said, "Idk i gotta go down there." Kimbrough said, "Take care of that baby jay on parole so he might be sitting." Arrington said, "I know bro. That's why I wanted us to take over his lane so we kan make sure he bool in there and have it ready when he get baxk." Kimbrough said, "I just got to get there bro that's it," and "I'm grabbing another zone today." Arrington said, "I'm tryna make some plays for us. If ya mans don't tap in today ima let someone else do what they want to the acct." Kimbrough said, "Login Address Card pic Pin Tele it." He then said, "I got a 19K check right now I can 10% pay them upfront," and "Gang." Arrington said, "Yup." Investigator Chaffins testified that based on his training and experience, taking over his "lane" is "slang for taking over his drug dealing business."

**{¶12}** The State played an August 13, 2024 jail call from 7:47 p.m., i.e., a few hours before the traffic stop. Investigator Chaffins testified that Kimbrough, Arrington, and Branner participated in the call. During the call, at one point the individual who initiated the call, i.e., Mathis, says, "You got me on speaker?" and someone responds, "Yeah." Shortly after that, the name "Juke" is mentioned, and there appears to be a new

voice on the call.  At one point during the call, someone says, "I'm about to try to handle some shit for you." Investigator Chaffins testified that this was "Juke," that Kimbrough sometimes goes by "Juke," and that he could recognize Kimbrough's voice "very easily." Shortly after that, Mathis mentions "telling Techie" something. Investigator Chaffins testified that Arrington goes by "Tech." Later, Mathis mentions Wendy having "the $18" and being "like an hour from Pop." Investigator Chaffins testified that based on the information and devices he gathered, "Pop" is a drug dealer who lives on Charleston Avenue in Huntington.

### D.  Testimony of Branner

{¶13}  Branner testified that he was indicted in this case too[2] and agreed to testify truthfully as part of a plea agreement under which he pled guilty to a reduced charge of possession of drugs, a second-degree felony, and the State agreed to recommend a sentence of two to three years in prison.  Branner testified that on August 14, 2024, at the time of the traffic stop, he was the front seat passenger in a vehicle Arrington was driving, and Kimbrough was in the back seat.  Arrington picked Branner up in Pontiac, Michigan, and they went to Kimbrough's house in the Detroit area.  Branner had previously spoken to Kimbrough on the phone a few times and met him once in June. Before they left Kimbrough's house, Arrington and Kimbrough looked in the trunk and under the car for a hiding spot for something, which Branner later learned was methamphetamine, but did not find one. Arrington and Branner had "weed" in the vehicle.  Branner had almost four pounds of it.  He testified that he also brought clothes, that he mainly wears small clothes but "can fit a medium," and that he might have brought medium clothes on the trip.

---

[2] The record does not reflect that Branner and Kimbrough were charged in the same indictment.

{¶14} At some point on the way to Huntington, Mathis called Arrington or Branner. Branner testified, "We was discussing -- I remember a few minutes was said -- it was on speaker and the phone was getting passed around, so I wasn't all the way whatever was said, but I know we was going to West Virginia [sic]. Charleston and Huntington." Later, Branner testified that the speaker on his phone was broken, so the phone was passed around. Branner testified that they were supposed to be going to a college and then another address, which he thought was "the Charleston address." Branner had previously gone to Huntington with Arrington in June or July, met a person at the college, and "made a little marijuana transaction." He and Arrington brought the marijuana and sold it. Kimbrough was not with them on that trip. Branner testified that he met, Mathis, who went by "Baby J," through Arrington. Branner identified the voices of Kimbrough, Mathis, Arrington, and himself on the jail call the State played, but the transcript does not specify at what point in the recording each identification was made. However, Branner testified that he answered the call and spoke to Mathis at the beginning of the call.

{¶15} During the traffic stop, after Arrington exited the vehicle, Branner saw Kimbrough remove the methamphetamine from his pants/underwear, put it in Kimbrough's bag, and put the bag in the trunk through the backseat, which had some feature which let the backseat move forward. At the time, the officer was in his vehicle. When shown the bag which contained the methamphetamine, Branner testified that he knew it belonged to Kimbrough because it was "the bag he had when we picked him up."

{¶16} During cross-examination of Branner, Kimbrough played Branner's recorded interview. During it, Branner refers to Kimbrough as "Juke." At one point, Branner says, "I just did time in Michigan. Three years." He says that was over a "felony

firearm." When asked if "dope" was involved, he admits it was and says "it was like manufacturing and delivering and felony firearm." When asked if it was a weed case, he says it was a "weed slash uh they found a little bit of coke." Branner also admits he was going to try to sell marijuana during the trip at issue. He tells Investigator Chaffins if he goes through his phone, the only drug he will see anything about is marijuana. Branner says he can go through the recently deleted messages. He indicates that he texted his "girl" that "they brought some shit down here." She said "hurry up and delete that." Investigator Chaffins appears to read the deleted messages aloud, including one saying, "These n****** brought other shit." After listening to his interview, Branner admitted he lied to police, denying knowledge of the big bags of marijuana, because he was scared.

### E. Closing Arguments

**{¶17}** During closing arguments, defense counsel stated, among other things, that

> we heard a recording where [Branner] talked about the fact that he had been convicted of trafficking drugs in Kentucky for [sic]. This man is a drug trafficker. He's an admitted drug trafficker. I don't think it's reasonable, but he's telling the truth when he says, I wasn't trafficking drugs this time. I didn't know what they had.

### F. Verdict and Post-Trial Proceedings

**{¶18}** The trial court found Kimbrough guilty on both counts and specifications. The court concluded the counts merged. The State elected to have the court sentence Kimbrough for aggravated trafficking in drugs with a major drug offender specification.

**{¶19}** After sentencing, Kimbrough filed a motion for a new trial pursuant to Crim.R. 33(A)(1). Relevant to this appeal, he asserted that "[i]t was discovered at the trial" that Patrolman Hutchinson "took cash from one or more of [the] defendants and failed to provide the same, or even the amount of same, to the Prosecuting Attorney." He

asserted "[t]he State, in turn, failed to disclose this evidence, which contradicted testimony by [Patrolman] Hutchinson, and was therefore . . . *Brady* material, to the Defendant in Discovery prior to trial." He claimed Patrolman Hutchinson's testimony "suggested, but did not establish, that [he] either destroyed or failed to preserve other items and information of evidentiary value in this case, which may become clear through further investigation." Kimbrough also asserted the State did not provide Branner's criminal record in discovery. He claimed "[i]t became apparent through [Branner's] recorded statement, played at trial, that he had previously been convicted of drug trafficking in the Commonwealth of Kentucky, apparently for a substance other than marijuana." He claimed "[t]his information, and possibly other information" in Branner's criminal record "could have been used to impeach his claims that he limits his drug trafficking to marijuana, and that he does not routinely travel to this area to traffic drugs." Kimbrough asserted the State presumably had Branner's criminal record as part of its investigation into Branner; therefore, it was *Brady* material and should have been provided to him.

{¶20} In response, the State asserted Kimbrough was "not charged with a forfeiture crime related to the drug charges he was found guilty of," that the money was in the body camera footage he received in discovery, and that he failed to show that the money was favorable to him or material to his guilt or punishment. Thus, he failed to show prejudice. Regarding Branner's criminal history, the State asserted Kimbrough could not show prejudice because there was overwhelming evidence of his guilt outside of Branner's testimony.

{¶21} The trial court denied the motion. The court found that the causes for a new trial in Crim.R. 33(A)(2) and (3) must be sustained by affidavit, and Kimbrough did not

attach affidavits to his motion. The court also found Kimbrough could not satisfy the causes for a new trial in Crim.R. 33(A)(1), (4), (5), or (6).

## II.  ASSIGNMENTS OF ERROR

**{¶22}** Kimbrough presents two assignments of error:

I.      The court erroneously denied Appellant's motion for a new trial.

II.     Appellant's convictions are against the manifest weight and sufficiency of the evidence.

## III.  LAW AND ANALYSIS

### A.  Motion for a New Trial

**{¶23}** In the first assignment of error, Kimbrough contends the trial court erroneously denied his motion for a new trial.  Kimbrough suggests he is entitled to a new trial under Crim.R. 33(A)(1) and/or (A)(2).  He asserts the denial of a motion for a new trial is generally reviewed for an abuse of discretion and that the trial court abused its discretion when it denied his motion "based on the State's failure to disclose that law enforcement seized the cash from the scene" and failure to disclose Branner's criminal history. He also asserts that when a motion for a new trial alleges prosecutorial misconduct, the appellate court undertakes a due process analysis to determine whether the misconduct deprived the defendant of his due process right to a fair trial.  He asserts that the key question is whether the evidence was material and that it is if there is a reasonable probability the result of the proceeding would have been different if the evidence had been disclosed to the defense.

**{¶24}** Kimbrough maintains there is a reasonable probability the outcome of the trial would have been different if the evidence at issue had been disclosed to the defense. He asserts that "[a] material fact police relied on during their investigation was that [he]

did not have any money on him." He claims the police did not believe he planned to stay in West Virginia due to his lack of money. However, the evidence showed police took "an unknown amount ranging from $100 to $1,000" from him. Kimbrough claims this amount "is not substantial for a drug trafficker" but "is a sufficient amount of money for someone looking to relocate and start a new job." He also asserts that the State primarily relied on Branner's testimony to show his knowledge and control over the methamphetamine. He claims the failure to disclose Branner's criminal history of drug trafficking before trial prejudiced him because the information was not available to cross-examine Branner at trial. He claims Branner's criminal history was information favorable to him and material to the outcome of this case. He asserts that "[w]ithout any further information beyond [Branner's] acknowledgement of a prior drug trafficking conviction in Kentucky, the extent of Mr. Branner's background is only known to the State," and this "deprived the fact-finder [of] sufficient information to determine Mr. Branner's credibility."

### 1.  Legal Principles

**{¶25}**  Crim.R. 33 governs motions for a new trial.  Crim.R. 33(A) states:

A new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights:

(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

. . .

**{¶26}**  Crim.R. 33(C) states, "The causes enumerated in subsection (A)(2) . . . must be sustained by affidavit showing their truth, and may be controverted by affidavit." When a defendant moves for a new trial under Crim.R. 33(A)(2) and fails to provide a

supporting affidavit, "the court, in its discretion, may summarily deny the motion." *State v. Miniard*, 2004-Ohio-5352, ¶ 41 (4th Dist.), citing *State v. Rogers*, 68 Ohio App.3d 4, 7 (9th Dist.). "This holds true even when the defendant alleges that the prosecutor improperly withheld exculpatory evidence." *Id.*, citing *State v. Smith*, 1998 WL 404458 (2d Dist. Mar. 27, 1998).

**{¶27}** In addition, Crim.R. 33(E) states that "[n]o motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of" reasons enumerated in Crim.R. 33(E)(1)-(4), which are not pertinent here, or "[a]ny other cause, unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a fair trial," Crim.R. 33(E)(5).

**{¶28}** "Generally, a trial court's denial of a motion for new trial under Crim.R. 33 is reviewed for an abuse of discretion." *State v. Inman*, 2013-Ohio-3351, ¶ 36 (4th Dist.), citing *State v. Adams,* 2009-Ohio-6491, ¶ 80 (4th Dist.). "'However, when the motion for a new trial alleges prosecutorial misconduct, we undertake a due process analysis to determine whether the misconduct of the prosecutor deprived the defendant of his due process right to a fair trial.'" *Adams* at ¶ 80, quoting *State v. Swartz*, 1993 WL 97727, *3 (4th Dist. Apr. 2, 1993), citing *State v. Johnston*, 39 Ohio St.3d 48, 59-60 (1988). "'By withholding evidence favorable to the accused, the prosecution violates the defendant's due process right to a fair trial where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecutor.'" *Id.* at ¶ 82, quoting *Swartz* at *3, citing *Johnston* at 60. "'[T]he key question is whether the suppressed evidence is "material."'" *Id.* at ¶ 83, quoting *Swartz* at *3. "'[S]uppressed evidence favorable to the accused is material only if there is a reasonable probability that the result of the

proceeding would have been different if that evidence had been disclosed to the defense.'" *Id.*, quoting *Swartz* at *3. "'A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Swartz* at *3, citing *Johnston at* paragraph five of the syllabus. "'The test, however, is stringent and the mere possibility that an item of undisclosed information might have helped the defense or might have affected the trial does not establish materiality.'" *Id.*, quoting *Swartz* at *3.

### 2. Analysis

**{¶29}** Although Kimbrough relies on both Crim.R. 33(A)(1) and (A)(2) in his appellate brief, he only made his motion for a new trial pursuant to Crim.R. 33(A)(1). Despite this, the trial court still considered Crim.R. 33(A)(2) but rejected the motion under that provision because Kimbrough failed to provide an affidavit as required by Crim.R. 33(C). In his appellate brief, Kimbrough acknowledges he did not provide an affidavit, and he does not argue that the trial court erred by summarily denying his motion on Crim.R. 33(A)(2) grounds based on that failure. Nonetheless, he continues to rely on Crim.R. 33(A)(2) on appeal and argues for application of a due process analysis for prosecutorial misconduct, even though prosecutorial misconduct falls under Crim.R. 33(A)(2).

**{¶30}** But even if we apply the analysis for which Kimbrough advocates, his first assignment of error fails because he has not shown a reasonable probability that the outcome of the trial would have been different if the evidence at issue had been disclosed to the defense. As to the cash, there appears to be no dispute that the State did not disclose the cash itself to the defense prior to trial. However, the cash Kimbrough had during the traffic stop is visible in Patrolman Birch's body camera footage, is discussed in

that footage, and is discussed during Kimbrough's recorded interview. The defense presumably received the body camera footage and Kimbrough's recorded interview during discovery because Kimbrough did not assert otherwise. Even if the defense did not have the footage or recorded interview before trial, the State played both during trial, and the defense cross-examined Patrolman Hutchinson and Patrolman Birch about the cash. Kimbrough indicated the amount he had was less than $200 during his recorded interview. But even if one could conclude from Patrolman Hutchinson's testimony that the unknown amount seized from Kimbrough was $1000 or more, the trial court heard that testimony, heard Patrolman Hutchinson's admission that if Kimbrough had money on him, the fact that he claimed to be traveling without clothes was less problematic, and heard evidence that Kimbrough claimed his mother was going to send him additional funds. Nonetheless, the court still found him guilty as charged. Kimbrough has not shown a reasonable probability that the outcome of the trial would have been different if the State had disclosed the cash itself prior to trial, and the trial court had known the exact amount seized from him when it rendered the verdict.

**{¶31}** As to Branner's criminal history, there appears to be no dispute that the State failed to provide the defense with Branner's record of prior convictions in accordance with Crim.R. 16(B)(2), which requires the prosecuting attorney to, upon receipt of a written discovery demand, provide copies or photographs, or permit defense counsel to copy or photograph, "[c]riminal records of the defendant, a co-defendant, and the record of prior convictions that could be admissible under Rule 609 of the Ohio Rules of Evidence of a witness in the state's case-in-chief[.]" The record reflects that Branner had prior convictions in Michigan (not Kentucky as argued by Kimbrough) for

manufacturing and delivering drugs and possession of a firearm.  However, Branner mentioned these prior convictions in his recorded interview, which the defense played at trial during cross-examination of Branner.  Thus, it is evident that the defense had this information available to cross-examine Branner at trial. During closing arguments, defense counsel even emphasized Branner's criminal history to undercut his credibility. Despite having this information, the trial court still found Kimbrough guilty.  Thus, there is no reasonable probability that the outcome of the trial would have been different if the State had disclosed the record of those prior convictions.

{¶32} Kimbrough's suggestion that he is entitled to a new trial because Branner might have other convictions known only to the State is not well-taken.  It appears the defense had Branner's recorded interview before trial as Kimbrough did not assert otherwise, and the defense played it at trial.  Thus, the defense should have been aware of the discovery violation before trial and could have filed a motion to compel discovery to learn if Branner had any other prior convictions. *See* Crim.R. 16(M).  Even if the defense only learned of Branner's recorded interview, and thus the discovery violation, during trial, Crim.R. 16(L)(1) states, "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule . . . , the court may order such party to permit the discovery . . .  or it may make such other order as it deems just under the circumstances."  Nonetheless, Kimbrough did not alert the court to the violation during trial and ask the court to order the State to comply with Crim.R. 16(B)(2). Instead, Kimbrough waited to raise the issue until after the court issued its final judgment.  Therefore, as it stands, nothing in the record shows Branner had any convictions beyond the Michigan ones he mentioned during his recorded interview. The

mere possibility Branner had additional convictions which might have affected the trial's outcome is insufficient to establish a right to a new trial.

{¶33} For the foregoing reasons, we conclude the trial court did not err in denying Kimbrough's motion for a new trial and overrule the first assignment.

### B. Sufficiency and Manifest Weight of the Evidence

{¶34} In the second assignment of error, Kimbrough contends his "convictions are against the manifest weight and sufficiency of the evidence." He maintains that "the State failed to meet [its] burden to prove every essential element of the case against [him], namely, that he knew there was methamphetamine in the car." He claims the State primarily relied on Branner's testimony to prove he knew there were drugs in the car and was involved in the alleged drug trafficking, but this testimony is insufficient to prove he was aware of the drugs in the car. Kimbrough suggests Branner's testimony lacks credibility and that the methamphetamine belonged to Branner and/or Arrington. Kimbrough asserts that Branner admitted he deleted messages during the traffic stop, lied to the police to get out of trouble, had a prior criminal history of drug trafficking, claimed a bag containing marijuana and medium shirts, and testified as part of a plea deal. Kimbrough also asserts that the car belonged to Arrington, that Branner traveled to West Virgina with Arrington before to traffic marijuana, and that Kimbrough had not traveled to West Virginia with them before. He claims no information was found on his phone, and that Mathis called Arrington and Branner, not him. He asserts that it was Branner who identified him as "Juke" on the recorded calls, that the calls contain no direct statements indicating he knew about the drugs or was involved in trafficking, and that it is unclear who is speaking to whom on the calls. And Kimbrough maintains that none of

the patrolmen testified to seeing him act unusual during the traffic stop and that "[t]here was no testimony that the trunk was accessible to [him] from the back seat."

### 1.  Standards of Review

**{¶35}** In reviewing the sufficiency of the evidence to support a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus*, superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4 (1997), and following *Jackson v. Virginia*, 443 U.S. 307 (1979). "A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness." *State v. Anderson*, 2019-Ohio-395, ¶ 13 (4th Dist.). We will not overturn a conviction based on insufficient evidence "'unless reasonable minds could not reach the conclusion that the trier of fact did.'" *State v. Cook*, 2019-Ohio-4745, ¶ 15 (4th Dist.), quoting *State v. Bradshaw*, 2018-Ohio-1105, ¶ 15 (4th Dist.).

**{¶36}** In determining whether a conviction is against the manifest weight of the evidence, an appellate court

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. In order to satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the [trier of fact] can find guilt beyond a reasonable doubt.
>
> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. However, we are

reminded that generally, it is the role of the [trier of fact] to determine the weight and credibility of evidence.

(Citations omitted.) *Anderson* at ¶ 14-15. "The trier of fact is free to believe all, part, or none of the testimony of any witness, and we defer to the trier of fact on evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." *State v. Chafin*, 2017-Ohio-7622, ¶ 32 (4th Dist.), citing *State v. Dillard*, 2014-Ohio-4974, ¶ 28 (4th Dist.), citing *State v. West*, 2014-Ohio-1941, ¶ 23 (4th Dist.).

**{¶37}** Although the trial court found Kimbrough guilty of aggravated trafficking in drugs and aggravated possession of drugs, the court merged the offenses and only sentenced him on the aggravated trafficking count. As a result, if we conclude his conviction on that count was supported by sufficient evidence and was not against the manifest weight of the evidence, an erroneous verdict on the merged count would be harmless. *State v. Alexander*, 2022-Ohio-1812, ¶ 38 (4th Dist.), citing *State v. Wickersham*, 2015-Ohio-2756, ¶ 21 (4th Dist.). Therefore, it would be unnecessary for us to address his sufficiency and manifest weight of the evidence argument with regard to the aggravated possession of drugs count. *Id.*, citing *Wickerham* at ¶ 21. Therefore, we will first address the aggravated trafficking conviction.

### 2.  Relevant Statutes

**{¶38}** The trial court convicted Kimbrough of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2) and (C)(1)(f). R.C. 2925.03(A)(2) states:

(A) No person shall knowingly do any of the following:

. . .

(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

**{¶39}** R.C. 2925.03(C)(1)(f) states:

(C) Whoever violates division (A) of this section is guilty of one of the following:

(1) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II, with the exception of marihuana, cocaine, L.S.D., heroin, any fentanyl-related compound, hashish, and any controlled substance analog, whoever violates division (A) of this section is guilty of aggravated trafficking in drugs. The penalty for the offense shall be determined as follows:

. . .

(f) If the amount of the drug involved equals or exceeds one hundred times the bulk amount and regardless of whether the offense was committed in the vicinity of a school, in the vicinity of a juvenile, or in the vicinity of a substance addiction services provider or a recovering addict, aggravated trafficking in drugs is a felony of the first degree, the offender is a major drug offender, and the court shall impose as a mandatory prison term a maximum first degree felony mandatory prison term.

Methamphetamine is a schedule II controlled substance. *See* Adm.Code 4729:9-1-02(C)(2); R.C. 2925.01(A) (as used in R.C. Chapter 2925, "controlled substance" and "schedule II" have same meaning as in R.C. 3719.01); R.C. 3719.01(C) ("controlled substance" includes "a drug, compound, mixture, preparation, or substance included in" schedule II); R.C. 3719.01(V) ("schedule II" means controlled substance schedule II as established by rule adopted under R.C. 3719.43). The bulk amount of methamphetamine is "an amount equal to or exceeding three grams." *See* R.C. 2925.01(D)(1)(g). Thus, one hundred times the bulk amount of it would be equal to or exceeding 300 grams.

**{¶40}** R.C. 2901.22(B) states:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

### 3. Analysis

{¶41} The State presented evidence from which the trial court could conclude Kimbrough knowingly transported over 100 times the bulk amount of methamphetamine, a schedule II controlled substance, when he knew or had reasonable cause to believe it was intended for sale or resale by him or another person. There was evidence that about 10 days before the traffic stop, Kimbrough and Arrington exchanged messages in which they discussed "baby jay" getting locked up, Arrington mentioned him and Kimbrough taking over baby jay's "lane" so it was ready when baby jay got back, and Kimbrough responded, "I just got to get there bro that's it." There was evidence "baby jay" was Mathis and that the term "lane" was slang for his drug dealing business. There was evidence that during the trip to West Virgina, Kimbrough participated in a call with Mathis and told Mathis, "I'm about to try to handle some shit for you." And Branner testified that during the stop, Kimbrough removed the methamphetamine from his underwear/pants, put it in Kimbrough's bag, and put that bag in the trunk while the two of them were alone in the vehicle. The trial court, which was in the best position to gauge Branner's demeanor, gestures, and voice inflections, was free to believe this testimony.

{¶42} Any rational trier of fact could have found the essential elements of aggravated trafficking in drugs proven beyond a reasonable doubt, and in resolving conflicts in the evidence, the trial court did not clearly lose its way and create such a

manifest miscarriage of justice that reversal of that conviction is necessary. Sufficient evidence supports the conviction, and the conviction was not against the manifest weight of the evidence. Consequently, any error the trial court may have committed by finding Kimbrough guilty of the merged offense of aggravated possession of drugs is harmless, and we need not consider his arguments as they relate to that offense. Accordingly, we overrule the second assignment of error.

## C. Conclusion

{¶43} For the foregoing reasons, we overrule the assignments of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

# **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.

For the Court

BY: _____
Michael D. Hess, Judge

## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**